**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────

**UNITED STATES OF AMERICA**

    - against -                                        **05 Cr. 202 (JGK)**

**DANIEL EGIPCIACO and LEO WILLIAMSON,**      **OPINION & ORDER**

                Defendants.
────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    Defendant Leo Williamson moves to suppress his post-arrest statements, alleging that these statements made after signing a <u>Miranda</u> waiver were the result of government coercion. Williamson specifically alleges that police officer Armando Rodriguez violently arrested him, punched him twice in the face, and was present in the interrogation room when Williamson signed the <u>Miranda</u> waiver. Williamson also alleges that he agreed to sign the <u>Miranda</u> waiver after being told that his co-defendant, Daniel Egipciaco, had given him up, that he was "going down for twenty-five years" unless he cooperated, and that if he cooperated he would be able to go home the next day. The following constitutes the Court's findings.

**I.**
**A.**

    Leo Williamson was arrested on February 3, 2005 at about 8:30 p.m. while sitting in the passenger seat of a car in a

- 1 -

McDonald's parking lot. (Undated Affidavit of Leo Williamson ("Williamson Aff.") ¶ 1.) Earlier that night, New York City Police Detectives Therone Eugene and Armando Rodriguez, Special Agent Joseph Mercurio of the Drug Enforcement Administration ("DEA"), and several other members of the "REDRUM" group of the New York Drug Enforcement Task Force initiated a robbery sting operation. (Tr. 5-7.) They surveilled a meeting in a white BMW--alleged to be Daniel Egipciaco's car and the same car Williamson was sitting in when arrested--and learned from a confidential informant participating in the meeting that there was a firearm in the car. (Id.)

The police officers followed the white BMW to a McDonald's parking lot, where Egipciaco and Williamson were allegedly going to intercept a load of narcotics. Receiving a signal from his supervisor, Detective Rodriguez positioned his Ford Expedition to block the white BMW in its parking space. Rodriguez and other officers, with guns drawn, approached the BMW. The driver of the BMW then rammed his car into the much larger Expedition to push his way out of the parking space, but was trapped. (Tr. 8-9, 105-106.) Williamson, who was sitting in the BMW's passenger seat, denies that the car ever rammed or touched the Ford Expedition. (Tr. 61.) This testimony is not credible; a photograph of the BMW taken after the alleged ramming indicated there was damage to

the front of the vehicle, with the black molding of the bumper knocked off. (Tr. 120-121; GX 13.) There was no other proffered explanation for the damage to the car, and the testimony of the police officers that the BMW rammed the Expedition was credible. The parties dispute whether Williamson was wearing a seatbelt when he was arrested after the alleged ramming. (Tr. 10, 48.)

Detective Rodriguez approached Williamson on the passenger-side of the BMW with his gun drawn and police shield visible, while other officers similarly approached the driver-side door. Detective Rodriguez testified that the officers were yelling "police, don't move, put your hands up, put your hands up," but that Williamson did not put up his hands. (Tr. 106-08.) Rodriguez testified that his only physical contact with Williamson was when he holstered his weapon and reached in through the window, using his left arm to pin Williamson's arms down while searching Williamson's waistband with his right hand for a weapon. (Tr. 108-09.) Rodriguez opened the door, allowing Detective Eugene and another officer to pull Williamson out of the car and onto the ground, where he was handcuffed facedown. Detective Eugene and another officer later assisted Williamson to his feet by holding his arms. (Tr. 11-12.)

Williamson's testimony of his arrest is markedly different, and is not credible. Williamson, a 29-year-old dance instructor,

had previously been arrested at least three or four times. (Tr. 63, 80.) He testified that while he and Egipciaco were getting food at McDonald's, five or six vehicles surrounded their car, and numerous individuals that he did not immediately recognize as police officers approached them with guns drawn, yelling "freeze, freeze." (Tr. 47-48; Williamson Aff. ¶¶ 2-4.) He allegedly had his hands up, and was asking "what's going on, what's going on?" (Tr. 48.)

According to Williamson, a very large officer, later identified as Detective Rodriguez, then allegedly reached through the open passenger-side window and punched Williamson in the face. (Tr. 48, Williamson Aff. ¶ 7.) According to Williamson's testimony, Rodriguez punched him twice in the face while holding a gun, undid his seatbelt, and dragged him out of the car onto the ground. (Tr. 48-49, 65.) However, Williamson's affidavit states that after the first punch, Williamson asked "what's going on?" and was then punched again. (Williamson Aff. ¶¶ 7-9.) Rather than alleging anybody dragged him to the ground, Williamson's affidavit states that he was directed to exit the vehicle and lie facedown on the ground, which Williamson did. (Id. at ¶ 10.) Williamson also testified that he saw Egipciaco similarly get hit in the face, although this allegation is not made in his affidavit, and there is no other evidence supporting

- 4 -

this assertion. (Tr. 67.) Detective Mercurio, who arrested Egipciaco, did not see anyone punch Egipciaco. (Tr. 131.)

Williamson alleges that while on the ground, somebody told him "you're going to know what's going on," kicked him in the back, handcuffed him, and pulled him up to a standing position by his handcuffs. (Tr. 50; Williamson Aff. ¶ 11.) Williamson testified that when the police officer pulled him up by the handcuffs he continued to ask him "what was going on, why did he hit me like that?" (Tr. 50.) The police officers deny lifting Williamson by his handcuffs, and Special Agent Mercurio testified that he would never lift someone by their handcuffed wrists since it would probably break or dislocate their arms. (Tr. 12, 133.) A photograph of Williamson taken shortly after his arrest showed that he had a swollen upper lip. (Tr. 13, GX 12.)

**B.**

After the arrest, which occurred at approximately 8:30 p.m., Williamson was brought directly to DEA's office about seventeen blocks away, where the officers did the arrest processing for Williamson and Egipciaco. (Tr. 12-13.) During the arrest processing and subsequent interrogation, Williamson was seated at a table and was not handcuffed. (Tr. 15.) Williamson asked for and was given water. (Tr. 17, 54.) None of the officers had

firearms in the arrest processing/ interrogation room (Tr. 30-31.)

At about 9:30 p.m., Detective Eugene and Special Agent Mercurio began speaking with Williamson in the arrest processing/interrogation room. (Tr. 140.) According to Williamson, Mercurio told Williamson that he "was going down for a Hobbs Act robbery or whatever, and that you can be held for twenty-five years, and that made [Williamson] start crying," and Mercurio said that if Williamson "helped him out with what he needed to know from [Williamson], that [Williamson] would be able to go home the next day." (Tr. 56; but see Williamson Aff. ¶ 13 (alleging that Williamson was told he "would be able to go home immediately").) Williamson alleged that Mercurio told Williamson that co-defendant Egipciaco "gave [Williamson] up." (Tr. 55; Williamson Aff. ¶ 12.) Williamson testified that the interrogation process lasted about two hours. (Tr. 53.)

Although these allegations are absent from his affidavit, Williamson further alleges that while being questioned he repeatedly asked for medical attention but was not offered any, and that an unknown police officer hit him in the back of his head. (Tr. 54-55, 75.) He alleges that Detective Rodriguez—the officer he claims punched him earlier--was present in the room for 30-45 minutes during the questioning, including at the moment

Williamson signed a Miranda waiver form.  (Tr. 53, 74, 125.)
Williamson states that Detective Rodriguez's presence made him feel "in danger and a little intimidated," but he still was able to confront Rodriguez in the interrogation room and ask, "why did you hit me?"  (Tr. 124-25.)

The police officers credibly deny that anybody hit Williamson in the interrogation room, or that Detective Rodriguez was present for the questioning.  Rodriguez candidly and credibly recalled seeing Williamson only "for about half a minute or a minute" when he was briefly in the arrest processing/interrogation room to deliver a document.  (Tr. 110-11.)  Eugene and Mercurio, the officers questioning Williamson, testified they noticed Williamson had a swollen lip, but did not recall Williamson asking for medical attention.  Mercurio testified that he asked Williamson how his lip was, and Williamson said, "No, I'm fine.  I'm OK."  (Tr. 145.)

Williamson was read a printed Miranda form, which Williamson, Eugene, and Mercurio all signed at 9:51 p.m. (Tr. 16-17; GX 11.)  Eugene and Mercurio had spent the time between 9:30 p.m. and 9:51 p.m. explaining "what [Williamson] was being charged with" and "about the benefits of cooperating and just talk[ing] about how much time he was looking at."  (Tr. 140.)

Eugene "explained to [Williamson] the minimal sentencing guidelines with the Federal Government as far as the charges that he could be charged with, the Hobbs Act robbery and the gun possession, and [Eugene] explained to him that the only way to have his sentencing be less than the minimal guidelines is through cooperation if, in fact, he lost at a trial." (Tr. 36.)

Mercurio testified that he told Williamson that "he was being charged with conspiracy to distribute narcotics, firearms violations, and a Hobbs Act robbery," and that "[f]or a conspiracy to distribute narcotics there was a minimum mandatory of ten years; for the firearms there was a minimum mandatory of five years; and for the Hobbs Act robbery it could be up to 20 years." (Tr. 135.) Mercurio further testified that Eugene told Williamson that "if he were to cooperate, he would be able to get a 5K letter from the government, thereby allowing the judge to go below the minimum mandatory." (Tr. 142.)

Eugene credibly denied telling Williamson that he "was going to be doing 25 years in prison," that he "would be able to go home right after he told [Eugene] whatever [Eugene] wanted to know," or how much time Williamson could get off his potential sentence. (Tr. 37.)

**II.**

By administering Miranda warnings, police protect and reinforce a defendant's Fifth Amendment right against self-incrimination. United States v. Anderson, 929 F.2d 96, 98 (2d Cir. 1991). The Government has the burden of establishing by a preponderance of the evidence that a suspect waived his Miranda rights and that his confession was voluntary. Colorado v. Connelly, 479 U.S. 157, 167-68 (1986). A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given. To determine whether a confession made during in-custody interrogation is voluntary, courts must consider "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." Andersen, 929 F.2d at 99 (citation omitted); see also United States v. Berkovich, 932 F. Supp 582, 586 (S.D.N.Y. 1996). Other "[r]elevant factors that should be considered include the accused's age, his lack of education or low intelligence, the failure to give Miranda warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989) (citation omitted). The Second Circuit Court of Appeals has "steadfastly avoided the adoption of any criterion

that, in and of itself, would mandate a finding of involuntariness and thereby undermine a thorough analysis of all the relevant circumstances." United States v. Bye, 919 F.2d 6, 9 (2d Cir. 1990) (citation omitted).

### III.

#### A.

In determining whether defendant Williamson's statement was voluntary, the Court looks at several factors, beginning with the characteristics of the defendant. The Court has had the opportunity to observe Williamson's demeanor, and finds Williamson to be articulate, fluent in English, and demonstrating no signs of below-average intelligence. Williamson is 29-years-old and employed as a dance instructor. He had previously been arrested "three or four times," and was thus familiar with the police. There is nothing about his background that suggests that he would be particularly vulnerable or susceptible to coercive questioning.

#### B.

The Court next considers the circumstances of Williamson's arrest to determine if they affected the conditions of his interrogation. In this case, they do not. It is clear from the police officers' testimony that the arrest was accomplished with

a show of great force, but that such a show of force was justified by the knowledge of the presence of a weapon. Additionally, the fact that the defendants' BMW rammed a police vehicle attempting to escape further supports the use of force. Williamson's testimony that the BMW did not ram the Expedition is not credible and is contradicted by photographic evidence of damage to the BMW and credible testimony by the officers.

Williamson was injured during the arrest, as demonstrated by the photograph of Williamson with a swollen lip. (See GX 12.) However, Rodriguez's account of the arrest is far more credible than Williamson's inconsistent account. Rodriguez is a physically large person. If Williamson were punched in the face twice, kicked in the back, and lifted from behind by his handcuffed wrists, he would have likely received more visible injuries than just a swollen lip. Having assessed Williamson's credibility, the Court finds his allegations as to the circumstances of his arrest not to be credible and to be grossly exaggerated. Williamson's sole apparent injury is more likely explained as being a result of Rodriguez forcefully restraining and searching Williamson for weapons and placing him on the ground, or by Williamson's alleged failure to wear a seatbelt when ramming the Expedition. In any event, the effect of the swollen lip was not a material factor in the conditions of the

interrogation, which occurred at the DEA office about one and a half hours later, and which was conducted by officers other than Rodriguez.  See Watson v. DeTella, 122 F.3d 450, 455 (7th Cir. 1997) (finding that the passage of time and change of location and questioning officer can insulate a confession from the taint of earlier coercion).

### c.

With respect to the conditions of the interrogation, the defendant was questioned in a room with two or three officers present.  The officers did not have guns in the interrogation room.  Williamson was seated and was not in handcuffs.  He asked for water and was given a bottle of water.  The questioning was not excessively long; Williamson estimates it lasted two hours.

Williamson alleges that he repeatedly requested medical attention and was denied, but this allegation is notably absent in his affidavit and is contradicted by the officers' credible testimony.  Williamson's alleged need for medical attention clearly did not prevent him from speaking intelligently, and "was not so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation by his interrogators."  Campaneria, 891 F.2d at 1020 (finding that

questioning of a defendant with a "serious knife wound" who "was in significant pain" was not coercive).

Williamson alleges that someone hit him in the back of the head during the interrogation. This allegation is also not credible. It is notably absent from Williamson's earlier affidavit, even though the affidavit makes other detailed allegations as to conduct in the interrogation room. (See, e.g., Williamson Aff. ¶¶ 12-15.) Similarly, Williamson's allegation that Rodriguez was present for 30-45 minutes of his interrogation is not credible. This allegation is absent from his earlier affidavit and contradicted by the testimony of others. The conditions of the interrogation do not suggest the statement was involuntary.

**D.**

Williamson alleges that the conduct of the police officers in making misrepresentations and threats of a long prison sentence rendered his statement involuntary. While affirmative misrepresentations by the police may be sufficiently coercive to invalidate a Miranda waiver, see Andersen, 929 F.2d at 100, "lies told by the police do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances." United States v. Velasquez,

885 F.2d 1076, 1088 (3d Cir. 1989) (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969)). Here, there is no evidence that the particular statements allegedly made to Williamson were materially false. Williamson contends that he was falsely told that unless he cooperated, he could not get under the mandatory minimum sentences and was "going down for twenty-five years," and that if he cooperated, he could go home the next day.

The testimony by Eugene and Mercurio, as outlined above, is far more credible. There was no promise that Williamson could go home the next day if he cooperated. Nor was there a promise of any specific time off for Williamson's cooperation. There was an explanation of the mandatory minimums for two of the offenses, and the potential sentence for a third offense. Both Mercurio and Eugene spoke of the advantages of cooperation. Eugene's statement that cooperation was the only way to have Williamson's sentence be less than the minimal guideline if he lost at trial was not materially false; it does not appear that Williamson qualified for the safety valve alternative. See 18 U.S.C. § 3553(f). Mercurio's recollection of a discussion of a 5K letter still only held out the prospect of allowing the judge to go below the mandatory minimum sentence.

This is not a case like United States v. Duvall, 537 F.2d 15, 25 (2d Cir. 1976), where the court held that telling a

defendant that he could be sentenced to 100 years in prison, "while technically correct as a matter of multiplication because of the large number of counts," was misleading and coercive, because no judge would impose such a sentence. Nor is this case like Andersen, where an agent falsely told a defendant three times that if he asked for a lawyer, it would permanently preclude him from cooperating with the police. Andersen, 929 F.2d at 100. Here, the officers were careful to couch their statements by telling Williamson that the "only way to have his sentencing be less than the minimal guidelines is through cooperation if, in fact, he lost at a trial." (Tr. 36.) Williamson's testimony makes it clear he understood that the twenty-five year sentence was a possible, not a certain, result of not cooperating. (Tr. 56 (Williamson was allegedly told "that you can be held for twenty-five years").)

The Second Circuit Court of Appeals has stated repeatedly that "the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation [does not] convert[] an otherwise proper encounter between the police and the accused into a coercive and overbearing experience." Bye, 919 F.2d at 9-10; see also United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) ("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not

improperly coercive.… Statements such as these are merely common sense factual observations." (internal citations omitted)); United States v. Pomares, 499 F.2d 1220, 1222 (2d Cir. 1974) ("It was quite proper … to mention the situation which [the defendant] faced and the advantages to him if he assisted the government."). Other courts have similarly refused to find statements regarding possible sentences to be coercive threats. See United States v. Braxton, 112 F.3d 777, 782 (4th Cir. 1997) (finding the statement "you can do five years because you're not coming clean" not an overpowering threat).

Cases that have held statements regarding potential sentences to be improper threats often involve other circumstances that factor into the "totality of the circumstances" evaluation. See, e.g., Duvall, 537 F.2d at 24 (noting that the defendant had been strip searched and held "[u]narraigned and uncounselled for 20 hours" when told of a possible 100-year sentence); United States v. Mora, 98 F. Supp. 2d 466, 479-80 (S.D.N.Y. 2000) (noting that a defendant, who had not been given his Miranda warnings and had been told that he was facing ten years in prison "was alone, in custody and unrepresented by counsel, and the promise of leniency was not 'mild,' it was strong and specific.")

Here, the police officers' statements as to the mandatory minimum sentences and possible sentences if convicted were not improper misrepresentations or threats.

**E.**

Finally, Williamson alleges that he was given an improper inducement when told that if he cooperated, the police would agree to a lesser charge and that he would be able to go home immediately. This testimony was not credible and is contradicted by the more credible recollections of Mercurio and Eugene. While both Mercurio and Eugene discussed the benefits of cooperation, neither promised a specific sentence. Furthermore, after this conversation, Williamson signed a Miranda waiver form that stated "[n]o promises or threats have been made to me." (GX 11.) In any event, "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." Bye, 919 F.2d at 9 (citation omitted).

Williamson's non-credible allegations do not amount to "unfulfillable or other improper promises [that] might perhaps overbear a defendant's will." Ruggles, 70 F.3d at 265. Thus, when evaluating the totality of the circumstances, the police officers' conduct does not support a showing that the defendant's statements were involuntary.

**CONCLUSION**

Having considered the totality of the circumstances, the Court finds that the Government has proved by a preponderance of the evidence that the defendant voluntarily waived his Miranda rights, and that the defendant's post-arrest statements were voluntary. Therefore, the motion to suppress is **denied**.

**SO ORDERED.**

**Dated: New York, New York
September 29, 2005**

John G. Koeltl
United States District Judge