**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**UNITED STATES OF AMERICA**

    - v -                              **05 Cr. 202 (JGK)**

**DANIEL EGIPCIACO,**                **MEMORANDUM
                                         OPINION AND ORDER**

        **Defendant.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    The jury in this case found the defendant, Daniel Egipciaco ("Egipciaco"), guilty of four counts of a six count indictment, namely conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951; conspiracy to distribute, or possess with intent to distribute, narcotics in violation of 21 U.S.C. § 846; using or carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c); and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). Egipciaco now moves pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for a judgment of acquittal notwithstanding the jury verdict on each of the four counts of which he was convicted. For the reasons explained below, the motion is **denied.**

**I.**

    There was sufficient evidence introduced at trial from which the jury could have found as follows. On February 3,

1

2005, agents of the New York Drug Enforcement Task Force (the "Task Force"), consisting of members of the Drug Enforcement Administration (the "DEA"), the New York City Police Department (the "NYPD"), and the New York State Police, arrested Egipciaco and another man, Leo Williamson ("Williamson"), in the parking lot of a McDonald's restaurant on West 34th Street in Manhattan.

The arrest resulted from a sting operation. The evidence at trial showed that the particular sting operation that led to Egipciaco's arrest was initiated by Jimmy Burgos ("Burgos"), a confidential informant. Burgos pleaded guilty to three charges and entered into a cooperation agreement with the Government. (Tr. at 231-32.) Burgos told officers of the Task Force that an acquaintance of his, known as "Junior," had sought work from Burgos in the past related to narcotics distribution or the robbing of narcotics dealers. (Tr. at 217-18; 234-36.) Burgos testified at trial that in early 2005 he offered to "propose something to Junior" and the Task Force officers told him to tell Junior that he (Burgos) was "going to be receiving eight kilos" of cocaine, and needed some people to take the cocaine from himself and a Colombian. (Tr. at 235-36, 240.) It is undisputed that no such Colombian actually existed. (See Tr. at 236.)

Burgos testified that Junior told him he knew someone named "Danny" who would do it. (Tr. at 237.) Burgos further

2

testified that Junior called "Danny" on his cell phone in Burgos's presence and had a conversation in Spanish, in which Junior reportedly told "Danny" that he was speaking to Burgos and that "something good was up." (Tr. at 237-38.) Burgos testified that Junior told "Danny" that "we should agree and that he [Junior] could give me [Burgos] the telephone number." (Tr. at 238.) Burgos then testified that, two or three days later, he called "Danny" at a phone number Junior had given him. (Tr. at 239.) Approximately one day later, on the evening of February 2, 2005, Junior met with Egipciaco in a car near Houston and Allen Streets in Manhattan, and Egipciaco agreed to rob the eight kilograms of cocaine from the Colombian source. (Tr. at 241-42; Gov't Ex. 1-T at 2-4, 14.) Unbeknownst to Egipciaco, Burgos was wearing a hidden recording device during the meeting, and the Government introduced into evidence at trial the recording of the conversation and a transcript of the conversation, both in the original Spanish and translated into English. (Gov't Ex. 1 and 1T, see also Tr. at 249-51.)

Burgos testified that on February 3, 2005, he placed a telephone call to Egipciaco and, at the direction of Task Force officers, this conversation was likewise recorded. As with the previous conversation in the car, the Government placed the recording and transcript into evidence at trial. (Gov't Ex. 2 and 2T, see also Tr. at 261-64.) Burgos asked Egipciaco if he

3

remembered their discussion of the previous night and Egipciaco answered that he remembered the conversation and that "it's all set," but that he needed more information about the time and place of the event. (Gov't Ex. 2T at 2-4; Tr. at 268-69.) Burgos testified that he thereafter had another telephone conversation with Egipciaco that was not recorded, in which he arranged to meet with Egipciaco that evening. (Tr. at 271-72.)

On the evening of February 3, 2005, Burgos met with Egipciaco, again in a car driven by Egipciaco, on a street corner in Manhattan. Another man was sitting in the back seat of the car during this meeting. (Tr. at 272-74.) Burgos testified, and the transcript corroborates, that he and Egipciaco discussed what was to transpire. (Tr. at 273-77.) In response to Egipciaco's inquiry about where the incident was to take place, Burgos identified for the first time the McDonald's restaurant at which Egipciaco was later arrested. (Gov't Ex. 3T at 5.)

Detective Therone Eugene of the NYPD ("Detective Eugene"), an officer of the Task Force, testified that, along with his supervisor, NYPD Sergeant Cornelius Clancy ("Sgt. Clancy") and Special Agent Joseph Mercurio of the DEA ("Agent Mercurio"), he had followed Burgos to the corner where this meeting took place, watched Burgos enter a white BMW and, once Burgos exited the

car, followed the car to the McDonald's parking lot, where the car backed into a parking spot along a wall. (Tr. at 59-62.)

Detective Eugene also testified that Sgt. Clancy and Agent Mercurio approached the BMW while he parked the vehicle in which they had been riding, and that he approached the BMW himself immediately thereafter. (Tr. at 62-64.) Agent Mercurio testified that while Detective Eugene was parking the car, a Ford Expedition driven by other members of the Task Force blocked the BMW's path and Task Force officers arrested Egipciaco and Williamson. Following the arrest, the officers found a pistol, three gloves, a ski mask and two additional hats in the BMW. These items were received in evidence at Egipciaco's trial. (Tr. at 68-69, 115-18; Gov't Ex. 6, 7, 8, and 9.) The jury returned a verdict of guilty on four of the six counts against Egipciaco, and a verdict of not guilty on the remaining two counts.

## II.

As Egipciaco concedes, a defendant bears a heavy burden on a Rule 29(c) motion seeking to overturn a jury's verdict of guilty. The Court's role is limited to determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

5

Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004). "[A] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." Espaillet, 380 F.3d at 718 (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)). "Although a conviction based on speculation and surmise alone cannot stand, the jury's verdict may be based entirely on circumstantial evidence and may be inferred from the evidence." United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (per curiam) (internal quotation marks and citations omitted).

Egipciaco moves for entry of a judgment of acquittal on each of the four counts on which he was convicted. Each of these counts is addressed separately.

**A.**

Egipciaco first challenges his conviction for conspiracy to commit a robbery in violation of the Hobbs Act, 18 U.S.C. § 1951, contending that the Government failed to prove beyond a reasonable doubt that he entered into an agreement with any culpable co-conspirator to commit a robbery. Robbery is defined in Section 1951 in relevant part as "the unlawful taking or obtaining of personal property from the person or in the

presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property...."  18 U.S.C. § 1951(b)(1).

Egipciaco is correct, and the Government does not dispute, that "no conspiratorial agreement exists unless at least two culpable co-conspirators agree, and consequently, the defendant's agreement must be with someone other than a government agent or informant."  United States v. Hendrickson, 26 F.3d 321, 333 (2d Cir. 1994).  Egipciaco urges that, at most, the evidence showed that he agreed with Jimmy Burgos ("Burgos"), a confidential government informant who testified against Egipciaco at trial.  In deciding a motion under Rule 29(c), however, the Court must "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted).  Applying that standard, there was sufficient evidence to allow a reasonable jury to find that Egipciaco conspired with persons other than Burgos to commit armed robbery.

First, there was sufficient evidence for a reasonable jury to conclude that Egipciaco agreed with Williamson to commit a robbery by means of actual or threatened force or violence. Compelling evidence came from Egipciaco's own admissions to

Burgos during their last recorded conversation prior to Egipciaco's arrest.  During that conversation, in which Egipciaco and Burgos discussed how the robbery was to be committed, Burgos asked Egipciaco if Williamson was one of Egipciaco's partners and Egipciaco responded, "Yeah.  Uh...he really knows what he's doing, you know."  (Gov't Ex. 3T at 9.) Burgos then asked, "Oh, has he also done a couple of jobs?," and Egipciaco replied, "Yeah, he's, he's, he's the one who's going to grab him from behind, you know what I mean?"  (Gov't Ex. 3T at 9.)  At another point in the conversation, Egipciaco said: "He's going to grab the guy and the other guy is going to pull out, you know...pull out the...the gun."  (Gov't Ex. 3T at 4; Tr. at 293-94.)[1]

Burgos testified that, during the same conversation, his request to Egipciaco, "Let me see your thing," referred to the gun that was to be used during the robbery.  (Gov't Ex. 3T at 12-13; Tr. at 275-76.)  He further testified that Egipciaco gestured to Williamson to hand him the gun, that Williamson did so, and that Egipciaco showed Burgos that the gun was not

---

[1] Egipciaco said that both Williamson and a third person would participate in the armed robbery and he described the roles of each. Egipciaco said he would pick up the third person on Eighth Avenue and 30th Street.  (Gov't Ex. 3T at 1-2, 4, 11-12.)  Given the strength of the evidence that Williamson was a co-conspirator in the conspiracy to commit an armed robbery, it is unnecessary to reach the Government's contention that there was sufficient evidence to find that Egipciaco conspired with the third person to commit that robbery.

8

loaded. (Tr. at 275-76, 299.) There was also testimony that, when Williamson and Egipciaco were arrested, the gun, gloves, hats, and ski mask were all found in the back seat, where Williamson had been sitting. (Tr. at 68-69, 115-18.) This testimony and physical evidence supports a conclusion that Williamson had agreed with Egipciaco to commit a robbery by means of actual or threatened force.

Egipciaco asserts, as he attempted to show at trial, that Williamson did not understand Spanish, and as a result did not understand the conversation between Egipciaco and Burgos. However, Burgos testified that Williamson "was into the conversation" and nodded at various points when Burgos talked about "ripping off or how things were going to be done." (Tr. at 274.) Williamson's action in producing the gun in response to the gesture and at the appropriate point in the Spanish conversation also supports his understanding the conversation. While Egipciaco argues that Burgos's testimony was not credible, the jury was entitled to credit this testimony. The Court may not, on a Rule 29 motion, substitute its own credibility assessment for that of the jury. Rather, "the truth of the prosecution's evidence must be assumed...." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

The defendant also argues that under Napue v. Illinois, 360 U.S. 264, 269 (1959), the Government has an affirmative

9

obligation to correct evidence it knows to be false, and contends that Williamson did not understand the conversation in the car between Egipciaco and Burgos. But there is no evidence to support the contention. The testimony supports a finding of Williamson's understanding and Williamson's actions, according to Burgos, support that understanding. The Government represented that it had no reason to doubt that Williamson understood the conversation. (Tr. at 362.) There is no basis for any relief under Napue.

Moreover, Egipciaco's own recorded statements that Williamson would be participating in the proposed robbery with him, and describing Williamson's role in the armed robbery, alone would allow the jury to conclude that Williamson and Egipciaco had reached an agreement to commit the robbery. There was also significant circumstantial evidence that Williamson had agreed with Egipciaco to commit the robbery: Williamson was arrested with Egipciaco at the time and place identified for the robbery, both had driven there in the same car following the meeting with Burgos describing the details of the robbery, and the gun, hats, ski mask, and gloves were found in the back seat, where Williamson had been sitting.

The evidence of Williamson's role thus went far beyond the evidence in United States v. Santos, 425 F.3d 86 (2d Cir. 2005), which Egipciaco cites in support of his argument. The evidence

implicating Williamson in the Hobbs Act conspiracy was not limited, as was the evidence in Santos, to mere presence at the purported robbery scene and records establishing that prior telephone calls had been placed between the defendant and a member of the conspiracy. See Santos, 435 F.3d at 98. On the record before the Court, particularly when drawing all inferences in favor of the Government, a rational jury could conclude that Egipciaco conspired with Williamson to commit a robbery by use of force.

Viewing the evidence in the light most favorable to the Government, as it must, the Court cannot conclude that no rational jury could have found that Egipciaco had conspired with another culpable co-conspirator to commit a robbery by use of actual or threatened force.

**B.**

Egipciaco next contends that he is entitled to a judgment of acquittal notwithstanding the jury verdict on Count Two of the indictment, conspiracy to distribute, or possess with intent to distribute, narcotics in violation of 21 U.S.C. § 846. For reasons similar to those explained above with respect to Count One, this assertion is also without merit.

First, the transcripts of the recorded conversations between Egipciaco and Burgos provide persuasive evidence that

Egipciaco understood that he would himself distribute, or possess with intent to distribute, narcotics.

The essence of the armed robbery that Egipciaco planned to carry out was a robbery of eight kilograms of cocaine from a Colombian drug dealer. In the first recorded conversation, Burgos told Egipciaco that the Colombian was giving him "eight kilos every three weeks." (Gov't Ex. 1T at 2, 5.) The Spanish word translated as "kilos" in this statement is "aparatos," which Burgos testified is a word frequently used to refer to a kilogram of cocaine, and a word he had used in that context in the past. (Gov't Ex. 1T at 2; Tr. at 244.) Burgos told Egipciaco "...when you see it's possible you steal the stuff. You know what I'm saying? I want you to steal...the eight kilos at the time they're delivered to me." Egipciaco responded, "...the eight whole ones," and Burgos said "the eight kilos." (Gov't Ex. 1T at 4.) The scheme also required that, having stolen and possessed the cocaine, half of the cocaine would be distributed to Burgos, who Egipciaco thought had set up the robbery, and the remaining kilograms would be the proceeds of the robbery to be divided among those who carried out the robbery.

Egipciaco said "Yeah, yeah, yeah," when Burgos referred to Egipciaco's taking four kilos for himself and whomever he would bring to do the robbery with him. (Gov't Ex. 1T at 6.) Burgos

12

again told Egipciaco, "You take four kilos for you," and asked him if he had "some people who could sell it," to which Egipciaco replied, "Yeah." (Gov't Ex. 1T at 7-8.) Burgos later asked Egipciaco, "So then what I want is to be clear; is 4 kilos for you guys good?" Again, Egipciaco replied, "Yeah. Four and four." (Gov't Ex. 1T at 13.) Burgos further indicated in the same conversation that he wanted Egipciaco to keep two kilograms from Burgos's share of the drugs and sell that portion of the drugs for him, and Egipciaco responded, "O.K." (Gov't Ex. 1T at 17.) In the final conversation in the car with Burgos, Egipciaco and Williamson, Egipciaco arranged to meet Burgos the next morning after the planned robbery to split up the drugs. (Gov't Ex. 3T at 10.)

Sufficient evidence also exists to support a conclusion that Egipciaco agreed with at least one other culpable co-conspirator to distribute, or possess with intent to distribute, narcotics. First, Burgos testified that Williamson appeared to understand what was being discussed in the third recorded conversation. (Tr. 273-74.) His further testimony that Williamson understood that Egipciaco wanted him to hand over the gun corroborates this account. (Tr. at 276-77.) Burgos's contention that Williamson understood the conversation is further supported by the fact that, in the transcript of the final conversation in the car on February 3, 2005, there is no

13

indication that Egipciaco said anything in English to Williamson concerning passing the gun to him, yet Burgos testified that Williamson did in fact pass the gun to him at the appropriate point in the conversation. (See Gov't Ex. 3T at 12-13; Tr. at 275-76.)

That conversation, like the first recorded conversation between Burgos and Egipciaco, contained multiple references to obtaining narcotics through the planned robbery and spliting up the drug proceeds of the robbery. (Gov't Ex. 3T at 3, 5-6, 10-11.) Williamson's understanding of the conversation would be sufficient evidence to establish his participation as a co-conspirator in the conspiracy charged in Count Two. As with the first conspiracy count, the jury could conclude, based on the testimony and the circumstantial evidence, that Williamson understood that he was participating in a conspiracy to distribute, or possess with intent to distribute, narcotics. Moreover, the circumstances of the proposed robbery support Williamson's knowledge of the narcotics conspiracy. As explained above, Egipciaco told Burgos that Williamson would grab the Colombian while the third member of the crew pulled out the gun. (Gov't Ex. 3T at 4.) Williamson was also found at the proposed robbery scene and the robbery paraphernalia were found in the back seat where he had been sitting. Further, the jury could reasonably have concluded that the drug proceeds were to

be divided among those who carried out the robbery, including Williamson. (Gov't Ex. 1T at 13-14.) The jury could conclude on those facts that Williamson was aware of the object of the proposed robbery. There is, therefore, sufficient evidence for the jury to find Williamson's knowing participation in the narcotics conspiracy.

There was also sufficient evidence for the jury to have found that Egipciaco and Junior conspired to distribute, or possess with intent to distribute, narcotics. Burgos testified that he told Junior that he "was going to be receiving eight kilos and that [he] needed some people to take it away, to take it off [himself] and a Colombian," and that Junior "said it wouldn't be a problem, that he would do it and that he knew somebody who would do it with him." Burgos then testified that Junior identified Egipciaco as the person who would do it with him. (Tr. at 236-37.)

During his first recorded conversation with Burgos, Egipciaco said that he had spoken to Junior again but that Egipciaco did not want to do too much talking on the phone. Egipciaco told Burgos that Junior told him, "you know, what we were going to work with and...you know, and that sort of thing, but now you can tell me all about it." (Gov't Ex. 1T at 2.) Egipciaco further discussed with Burgos sharing the drugs with Junior. In response to Burgos's statement that he was "going to

take Junior's cut out," Egipciaco replied, "[i]t's separate." Burgos then stated that he was "going to give Junior a kilo" and Egipciaco responded, "Yeah, yeah." Burgos also told Egipciaco that the purpose of giving the kilo to Junior was "because he...he...he brought me to you guys...." Egipciaco replied: "Right, yeah." (Gov't Ex. 1T at 14.) The jury could conclude that Junior and Egipciaco agreed, either directly with each other or through Burgos, to commit the robbery and thereby obtain narcotics for the purpose of distribution, and that each was to receive a share of the drug proceeds of the robbery. "[P]arties can conspire through a non-conspiring intermediary, even a government informant." Bicaksiz, 194 F.3d at 399 (citing United States v. Medina, 32 F.3d 40, 44-45 (2d Cir. 1994)).

A rational jury could therefore conclude that Egipciaco had conspired with at least one culpable co-conspirator to distribute, or possess with intent to distribute, narcotics.

### C.

Egipciaco's only challenge to the jury's verdict of guilty on Count Three, using or carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c), is that it cannot stand if a judgment of acquittal is entered on Count One, the conspiracy to commit a Hobbs Act robbery, because liability on Count Three is contingent upon

16

liability on Count One, which represents the requisite predicate crime of violence.  For the reasons explained above, the motion for a judgment of acquittal is denied with respect to Count One.  Accordingly, there is no basis for entering a judgment of acquittal notwithstanding the jury's verdict on Count Three.

**D.**

Egipciaco also moves for a judgment of acquittal on Count Six, possession of a firearm in or affecting commerce by a convicted felon in violation of 18 U.S.C. § 922(g).  This Count was tried to the jury after it had returned a verdict of guilty on the three counts discussed above.  The parties stipulated that Egipciaco had a prior felony conviction in New York State Supreme Court, New York County.  Egipciaco does not contest that the firearm that he was alleged to have possessed had traveled in interstate commerce.  Egipciaco focuses solely, therefore, on the adequacy of the evidence relating to his knowing possession of the firearm.

Egipciaco cites a note written by the jury during their deliberations.  In that note, the jurors asked the Court to clarify the law with respect to Count Five, which charged that the defendant knowingly possessed or received a firearm with the manufacturer's serial number removed, obliterated, or altered in violation of 18 U.S.C. §§ 922(k) and 2.  Specifically, they

17

asked for "clarification on how aiding and abetting relates to Count Five" and whether "the defendant [has] to be aware that the serial number was obliterated...." (Court Ex. 11; Tr. at 618.) The Court informed the jury, by note in response, that "an element of the offense in Count Five is that the defendant know that the serial number was obliterated, this is also an element for proving the offense of aiding and abetting a violation of Count Five. In other words, a defendant does have to be aware that the serial number was obliterated in order to find the defendant guilty of Count Five." (Court Ex. 12; Tr. at 621.)

Egipciaco argues that, because he was convicted on Count Three, using or carrying a firearm during and in relation to a crime of violence, but acquitted on Count Five, possession of a firearm with an obliterated serial number, "the most reasonable inference is that the jury concluded that Egipciaco was not the actual possessor of the firearm but rather an aider and abettor thereof." (Def.'s Brief dated Nov. 9, 2005, at 12.) He therefore asserts that his conviction on Count Six cannot stand because, under 18 U.S.C. § 922(g), actual possession is required and there is no liability for aiding and abetting.

As an initial matter, inconsistent verdicts on two or more counts do not constitute a basis for disturbing a jury's findings. See United States v. Powell, 469 U.S. 57, 66-69

18

(1984); see also United States v. Acosta, 17 F.3d 538, 544-45 (2d Cir. 1994). Rather, the sufficiency of the evidence must be considered independently for each count. Powell, 469 U.S. at 67; Acosta, 17 F.3d at 545.

In any event, there is nothing inconsistent about the jury's verdict. The jury may well have found Egipciaco guilty of Count Three on a theory of actual possession rather than aiding and abetting, but acquitted him of Count Five because it found that the Government had failed to prove beyond a reasonable doubt that he was aware that the serial number on the gun had been obliterated. Indeed, the jury asked to see the firearm in the course of their deliberations and they could have concluded that the defendant possessed the firearm but did not observe the obliterated serial number.

More fundamentally, Egipciaco does not argue that there is insufficient evidence to allow a rational jury to conclude that he possessed the firearm for at least some period of time. Burgos testified that Williamson handed the gun to Egipciaco, who then showed Burgos that it was not loaded. (Tr. at 276.) The jury was instructed, with respect to Count Six, that a defendant may possess an object if he had the power and intention to exercise control over it, even though it was not in his physical possession. (Tr. at 635-36.) The jury was further instructed that possession may be sole or joint. (Tr. at 636.)

19

On the record in this case, a rational jury could conclude that Egipciaco possessed the firearm under one or more of these theories. There is therefore no basis to disturb the jury's verdict of guilty on Count Six.

## CONCLUSION

For the reasons explained above, Egipciaco's motion pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for a judgment of acquittal on Counts One, Two, Three, and Six is **denied**.

SO ORDERED.

Dated: New York, New York
April 7, 2006

John G. Koeltl
United States District Judge