UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

v.                                                    05 Cr. 202 (JGK)

DANIEL EGIPCIACO,

                    Defendant.
-----------------------------------------------------X


**DEFENDANT DANIEL EGIPCIACO'S
MEMORANDUM OF LAW REGARDING SENTENCING**


RICHARD JASPER, ESQ. (RJ-7559)
276 Fifth Avenue, Suite 501
New York, New York 10001
(212) 689-3858

– On the brief –
Richard Jasper, Esq.
Michael K. Bachrach, Esq.

*Attorneys for Daniel Egipciaco*

# Table of Contents

Table of Exhibits ................................................................................................ ii

Table of Authorities.......................................................................................... iii

Preliminary Statement ....................................................................................... 1

I.      Introduction ............................................................................................ 1

II.     Sentencing Under Booker ....................................................................... 2

III.    Statutory Mandatory Minimum Sentences............................................ 10

IV.     Advisory Guideline Calculation ........................................................... 17

        A.      Objection to Probation Department's enhancement for
                Egipciaco's Role in the Hobbs Act Conspiracy (Count 1) ...................... 18

        B.      Objection to Probation Department's reliance on
                Statutory mandatory minimums when calculating
                Egipciaco's non-mandatory Guideline sentence ..................................... 18

        C.      Additional factors relevant to advisory Guideline range ......................... 19

V.      Offense Conduct .................................................................................... 19

VI.     Application of the Statutory § 3553(a) Factors to this Case ................ 20

        A.      Nature and Circumstances of the Offense ............................................... 21

        B.      History and Characteristics of Daniel Egipciaco ..................................... 21

VII.    Reasons for a Non-Guideline Sentence under 18 U.S.C. § 3553(a)..................... 26

VIII.   Conclusion.............................................................................................. 27

Certificate of Service ........................................................................................ 28

## Table of Exhibits

Letter, dated, January 5, 2006, from Alida Egipciaco ......................................... Exhibit A

Letter, dated, September 30, 2005, from Anna Felipe ........................................ Exhibit B

Letter, dated, January 2, 2006, from Reinaldo Egipciaco ................................... Exhibit C

Letter, dated, August 16, 2005, from Rev. Paul W. Jervis ................................. Exhibit D

Letter, dated, November 26, 2005, from Angie Bonilla ...................................... Exhibit E

# Table of Authorities

CASES

Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219 (1998) .......... 3

Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000)................. 3, 11, 13

Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004) ............................ 3

Harris v. United States, 536 U.S. 545, 122 S.Ct. 2406 (2002)....................... 11, 13

Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035 (1996)............................... 12

Melendez v. United States, 518 U.S. 120, 116 S.Ct. 2057 (1996) ....................... 12

Minnesota State Board For Community Colleges v. Knight, 465 U.S. 271,
104 S.Ct. 1058 (1984).......................................................................... 12

Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647 (1989) ......................... 14

Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159
(1935)................................................................................................. 12

Rogers v. Lodge, 458 U.S. 613, 102 S.Ct. 3272 (1982) ..................................... 12

Schweiker v. Wilson, 450 U.S. 221, 101 S.Ct. 1074 (1981)............................... 12

Shepard v. United States, 544 U.S. 13, 125 S.Ct. 1254 (2005)............................ 3

Simon v. United States, 361 F.Supp.2d 35 (E.D.N.Y. 2005)................................ 9

United States v. Ameline, 400 F.3d 646 (9th Cir. 2005) ...................................... 6

United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005) .................................... 7

United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005)................. 1, 2, 3, 4,
6, 7, 9, 11

United States v. Cooper, 437 F.3d 324 (3d Cir. 2006) ........................................ 8

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) ........................... 2, 8, 9, 10

United States v. Denardi, 892 F.2d 269 (3d Cir. 1989) ........................................ 7

United States v. Emmenegger, 397 F.Supp.2d 416 (S.D.N.Y. 2002)................... 21

United States v. Fairclough, 439 F.3d 76 (2d Cir. 2006).......................................8

United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006) ..............................2, 8, 9

United States v. Garcia, 413 F.3d 201 (2d Cir. 2005) .........................................18

United States v. Haynes, 985 F.2d 65 (2d Cir. 1993)..........................................11

United States v. Jaber, 362 F.Supp.2d 365 (D.Mass. 2005) ..........................6, 21

United States v. Jackson, 59 F.3d 1421 (2d Cir. 1995) ...............................11, 12

United States v. Jackson, 968 F.2d 158 (2d Cir. 1992) .......................................11

United States v. James, 478 U.S. 597, 106 S.Ct. 3116 (1986)............................14

United States v. Jimnez-Beltre, 440 F.3d 514 (1st Cir. 2006) ..............................8

United States v. Lara, 905 F.2d 599 (2d Cir. 1990)............................................19

United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995)........................................19

United States v. Moore, 54 F.3d 92  (2d Cir. 1995) ............................................10

United States v. Naylor, 359 F.Supp.2d 521 (W.D.Va. 2005)..............................6

United States v. Nellum, Docket No.  No. 2:04-CR-30-PS,
2005 W.L. 300073 (N.D.Ind. Feb. 3, 2005)..........................................................5

United States v. Phillips, 431 F.3d 86 (2d Cir. 2005)...........................................4

United States v. Ranum, 353 F.Supp.2d 984 (E.D.Wisc. 2005) ...........................6

United States v. Rodriguez, 724 F.Supp.1118 (S.D.N.Y. 1989).........................19

United States v. Sheikh, 433 F.3d 905 (2d Cir. 2006).........................................11

United States v. Stevens, 19 F.3d 93 (2d Cir. 1994) .....................................11, 12

United States v. Vaughn, 430 F.3d 518 (2d Cir. 2005) .........................................4

Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079 (1949)...............................14

# STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 111 ................................................................................................ 1

18 U.S.C. § 922 ................................................................................................ 1

18 U.S.C. § 924 ................................................................................................ 1

18 U.S.C. § 1951 .............................................................................................. 1

18 U.S.C. § 3553 ...................................................................................... 2, 3, 4, 5,
6, 7, 9, 11,
13, 20, 26

18 U.S.C. § 3582 .............................................................................................. 5

18 U.S.C. § 3661 .............................................................................................. 5

18 U.S.C. § 3742 .............................................................................................. 3

21 U.S.C. § 841 ................................................................................. 10, 13, 14, 16
17

21 U.S.C. § 846 ........................................................................................... 1, 10

28 U.S.C. § 991 ............................................................................................. 14

Fed.R.Crim.P. 29 ............................................................................................ 2

U.S.S.G. § 5G1.1 ................................................................................... 2, 5, 9, 11

U.S.S.G. § 5H1.1 ............................................................................................. 9

U.S.S.G. § 5H1.2 ............................................................................................. 9

U.S.S.G. § 5H1.3 ............................................................................................. 9

U.S.S.G. § 5H1.4 ............................................................................................. 9

U.S.S.G. § 5H1.5 ............................................................................................. 9

U.S.S.G. § 5H1.6 ............................................................................................. 9

132 Cong. Rec. § 14288 ................................................................................. 15

132 Cong. Rec. § 14289 ................................................................................. 15

132 Cong. Rec. § 14301 ........................................................................... 15

H.R.Rep. No. 99-845, 99th Cong., 2d Sess. 11-12 (1986) .................................. 15

Narcotics Penalties and Enforcement Act of 1986, Pub. L. 99-570,
Title I, Sec. 1001, Oct. 27, 1986, 100 Stat. 3207-2 ............................................ 14

Hatch, <u>The Role of Congress in Sentencing: The United States Sentencing
Commission, Mandatory Minimum Sentences, and the Search for a Certain
and Effective Sentencing System</u>, 28 Wake Forest L. Rev. 185, 198 (1993) ....... 12

Schulhofer, <u>Rethinking Mandatory Minimums,</u> 28 Wake Forest L. Rev. 199
(1993) ................................................................................................................ 12

<u>**Preliminary Statement**</u>

This Memorandum of Law addresses issues relevant to the upcoming sentencing of Defendant Daniel Egipciaco, currently scheduled for June 2, at 2:30 p.m. This sentencing memorandum will address issues including the background and character of Mr. Egipciaco, the constitutionality of mandatory minimum sentencing as applied to the instant offenses, and the effect of <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005), on his sentencing.

**I.     <u>Introduction</u>**

On October 14, 2005, Mr. Egipciaco was found guilty, after a jury verdict, of: one count of Conspiracy to Commit Robbery in violation of 18 U.S.C. § 1951 (Count 1); one count of Conspiracy to Distribute and Possess with Intent to Distribute Cocaine in violation of 21 U.S.C. § 846 (Count 2); one count of Carrying a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3); and one count of being a Felon-in-Possession in violation of 18 U.S.C. § 922(g)(1) (original Count 5, referred to as "Count 6" as charged to the jury). Count 1 carries no statutory minimum sentence and a statutory maximum of 20 years imprisonment. Count 2 carries a mandatory minimum sentence of 20 years imprisonment and maximum of life imprisonment. Count 3 carries a mandatory minimum of 5 years imprisonment and a statutory maximum of life imprisonment. Count 6 carries no mandatory minimum and a statutory maximum sentence of 10 years imprisonment. Egipciaco was acquitted of charges of Assaulting, Resisting, and Impeding Law Enforcement Personnel (18 U.S.C. § 111) (Count 4) and Possession and Receipt of a Firearm with an Obliterated Serial Number (18 U.S.C. § 922[k]) (original Count 6, referred to as "Count 5" as charged to the jury). On April 7,

2006, this Court denied Mr. Egipciaco's Rule 29(c) motion to dismiss notwithstanding the jury verdict as to Courts 1, 2, 3 and 6.

The Department of Probation has recommended a Combined Adjusted Offense Level of 32, which carries a non-mandatory Sentencing Guideline range of 151-188 months. However, because Mr. Egipciaco has a prior felony conviction, the mandatory statutory minimum sentence on Count 2 is increased to 240 months imprisonment. Further, an additional and consecutive term of 60 months imprisonment is required by Count 3. As such, Egipciaco's mandatory minimum statutory sentence, as well as his advisory Guideline range (see U.S.S.G. § 5G1.1[b]), is 300 months imprisonment (i.e., 25 years). Nonetheless, for the reasons that follow, we respectfully request that this Court find the statutory mandatory minimum sentence to be unconstitutional as applied to Mr. Egipciaco, and as such to sentence Mr. Egipciaco to a lenient sentence below the statutory minimum requirement.

## II.    Sentencing Under Booker

As the Court is aware, the Federal Sentencing Guidelines are no longer mandatory but one of several factors which the Court must consider in imposing sentence. See United States v. Booker, supra, 543 U.S. 220, 125 S.Ct. 738 (2005); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Under Booker and Crosby, the Sentencing Guidelines must be calculated and consulted but are no longer mandatory. Rather, the Court must consider all of the factors in the Federal Sentencing Act, Title 18 U.S.C. § 3553(a) ("FSA"), and appellate courts will review sentences imposed by district courts to determine whether they are reasonable. See United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) (recognizing that "in the overwhelming majority of cases, a Guidelines

sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances," however "declin[ing] to establish any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable").

In Booker, the Supreme Court ruled that is Sixth Amendment holdings in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000) apply to the Federal Sentencing Guidelines, the Court found "no relevant distinction between the sentence imposed pursuant to the Washington statutes in Blakely and the sentences imposed pursuant to the Federal Sentencing Guidelines," in the case before the Court. Booker, 125 S.Ct. at 751. Accordingly, reaffirming its holding in Apprendi, the Court concluded:

> Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

Id. at 756.[1] Based on this conclusion, the Court further found those provisions of the federal Sentencing Reform Act of 1984 that make the Guidelines mandatory, 18 U.S.C. § 3553(b)(1) or which rely upon the Guidelines' mandatory nature, 18 U.S.C. § 3742(c), incompatible with its Sixth Amendment holding. See Booker, 125 S.Ct. at 756.

---

[1]  It should be noted that the fact-of-prior-conviction exception to the Apprendi rule is based on Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219 (1998). But the continued vitality of this case and the exception it created has been called into question not only by the broad reasoning of Booker itself, which would seem to apply to all enhancement facts, including facts of prior conviction, but also more recently by Shepard v. United States, 125 S.Ct. 1254 (2005). Sheppard sharply limits the Almendarez-Torres exception to the fact of prior conviction as determined by the judicial record, and excludes facts about the conviction that are not contained in such conclusive records. As Justice Thomas notes, moreover, five justices agree that Almendarez-Torres was wrongly decided. See Sheppard, 125 S.Ct. at 1264 (Thomas, J., concurring).

Accordingly, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." Id. at 757.[2]

Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by Booker:

> requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a).

Booker, 125 S.Ct. at 757. Thus, under Booker, sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C.§ 3553(a).

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

---

[2]      We further note that we are cognizant of the Second Circuit's holding in United States v. Vaughn, 430 F.3d 518 (2d Cir. 2005), which affirmed the use of acquitted conduct in post-Booker sentencing proceedings.  See also United States v. Phillips, 431 F.3d 86 (2d Cir. 2005) (approving the use of unadjudicated juvenile conduct at sentencing).  We respectfully submit, however, that the Second Circuit's opinions on this issue are at odds with the merits majority in Booker, and we ask this Court to consider whether all factors relevant to sentencing must now be proven beyond a reasonable doubt.  Assuming arguendo that this Court determines that the Second Circuit's decisions are sound, and that a preponderance standard may be used during sentencing, then at a minimum we respectfully request that Mr. Egipciaco's objection be noted for the record so that it may be preserved for potential appellate review.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

> the nature and circumstances of the offense and the history and characteristics of the defendant [18 U.S.C. § 3553(a)(1)];

> the kinds of sentences available [18 U.S.C. § 3553(a)(3)];

> any pertinent policy statement … issued by the Sentencing Commission … [18 U.S.C. § 3553(a)(5)(A)];

> the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct [18 U.S.C. § 3553(a)(6)]; and

> the need to provide restitution to any victims of the offense [18 U.S.C. § 3553(a)(7)].

Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. See U.S.S.G. § 5H1; see also United States v. Nellum, Docket No.

No. 2:04-CR-30-PS, 2005 W.L. 300073 (N.D.Ind. Feb. 3, 2005) (Simon, J.) (taking into account fact that defendant, who was 57 at sentencing, would upon his release from prison have a very low likelihood of recidivism since recidivism reduces with age; citing, Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, May 2004); United States v. Naylor, 359 F.Supp.2d 521 (W.D.Va. 2005) (Jones, J.) (concluding that sentence below career offender guideline range was reasonable in part because of defendant's youth when he committed his predicate offenses – he was 17 – and noting that in Roper v. Simmons, 125 S.Ct. 1183, 1194-96 [2005], the Supreme Court found significant differences in moral responsibility for crime between adults and juveniles).

The directives of Booker and 18 U.S.C. § 3553(a) make clear that courts may no longer uncritically apply the Guidelines. Such an approach would be "inconsistent with the holdings of the merits majority in Booker, rejecting mandatory Guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the § 3553(a) factors, many of which the [G]uidelines either reject or ignore." United States v. Ranum, 353 F, Supp. 2d 984, 985-86 (ED.Wisc. 2005) (Adelman, J.).

As another district court judge has correctly observed, any approach that automatically gives "heavy" weight to the Guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in Booker." United States v. Jaber, 362 F.Supp.2d 365, 371 (D.Mass. 2005) (Gertner, J.); see also United States v. Ameline, 400 F.3d 646, 655-56 (advisory Guideline range is "only one of many factors that a

sentencing judge must consider in determining an appropriate individualized sentence"), adopting limited remand on reh'g en banc, 409 F.3d 1073 (9th Cir. 2005).

Justice Scalia explains the point well in his dissent from Booker's remedial holding:

> [L]ogic compels the conclusion that the sentencing judge, after considering the recited factors (including the [G]uidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise – if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed – its opinion would surely say so.

Booker, 125 S.Ct. at 791 (Scalia, J., dissenting in part). Likewise, if the remedial majority thought the Guidelines had to be given "heavy weight," its opinion would have said so. The remedial majority clearly understood that giving any special weight to the Guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider all of the Section 3553(a) factors, not just the Guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. Moreover, where the Guidelines conflict with other sentencing factors set forth in 18 U.S.C. § 3553(a), these statutory sentencing factors should generally trump the Guidelines. See United States v. Denardi, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part) (arguing that since 18 U.S.C. § 3553[a] requires sentence to be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within Guideline range).

The FSA does not state the weight that the Court should give to the Guidelines in calculating the appropriate sentence. Initially, in Crosby, the Second Circuit declined to rule on this question, rather it said that it would "permit the concept of 'consideration' in the context of the applicable Guidelines range to evolve as district judges faithfully perform their statutory duties." Crosby, 397 F.3d at 113. More recently, however, in Fernandez, the Second Circuit determined that the Guidelines are not presumptively reasonable:

> [W]e have expressed a commitment to avoid the formulation of *per se* rules to govern our review of sentences for reasonableness. See Crosby, 397 F.3d at 115; see also United States v. Fairclough, 439 F.3d 76, 80 (2d Cir. 2006). We therefore decline to establish any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable. See United States v. Jiménez-Beltre, 440 F.3d 514, 517 (1st Cir. 2006) (en banc) (explaining that "[w]e do not find it helpful to talk about the guidelines as 'presumptively' controlling or a guidelines sentence as 'per se reasonable,' " because, "[a]lthough making the guidelines 'presumptive' or 'per se reasonable' does not make them mandatory, it tends in that direction; and anyway terms like 'presumptive' and 'per se' are more ambiguous labels than they at first appear"); [United States v.] Cooper, 437 F.3d [324,] 331-32 [(3d Cir. 2006)] (rejecting a non-rebuttable presumption because it would effectively restore the mandatory nature of the Guidelines and rejecting a rebuttable presumption because "[a]ppellants already bear the burden of proving the unreasonableness of sentences on appeal").

Fernandez, 443 F.3d at 27. The Court continued, "Although the Guidelines range should serve as 'a benchmark or a point of reference or departure,' … for the review of sentences, as well as for their imposition, we examine the record as a whole to determine whether a sentence is reasonable in a specific case. Accordingly, we do not hold that a Guidelines sentence, without more, is 'presumptively' reasonable." Fernandez, 443 F.3d

at 28 (emphasis in original), <u>citing</u>, <u>United States v. Rubenstein</u>, 403 F.3d 93, 98-99 (2d Cir. 2005); <u>Crosby</u>, 397 F.3d at 113.

Judge Sifton in a thoughtful opinion rendered prior to <u>Fernandez</u> held that the "Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by § 3553(a)." <u>Simon v. United States</u>, 361 F.Supp.2d 35, 40 (E.D.N.Y. 2005). Judge Sifton based his holding on three considerations: first, as noted above, the FSA does not "does not distinguish between the weight to be given to any of the factors;" second, "the greater the weight given to the Guidelines, the closer the Court draws to committing the act that <u>Booker</u> forbids – a Guideline sentence based on facts found by a preponderance of the evidence by a judge;" and third, Judge Sifton recognized that there is "tension if not conflict" between the FSA and the Guidelines. <u>Simon</u>, 361 F.Supp.2d at 40.

With respect to the third factor enunciated by Judge Sifton, the FSA requires the Court to consider factors such as "the history and characteristics of the defendant" (<u>see</u> 18 U.S.C. § 3553[a][1]), while the Guidelines limit the Court to departures based on "offender-specific characteristics" only in exceptional cases (<u>see</u> U.S.S.G. § 5H1.l). Indeed, as Judge Sifton points out, under U.S.S.G. §§ 5H1.1 – 5H1.6 some factors such as age, educational and vocational skills, mental and emotional conditions, physical condition, employment record, and family ties and responsibilities are not normally relevant. These same facts, however, would be relevant when determining "the history and characteristics of the defendant" as required by 18 U.S.C. § 3553(a)(l). The only resolution is to accord these factors equal weight in crafting an appropriate sentence.

## Non-Guidelines Sentences Do Not Require Departures from the Guidelines

Finally, we note that the Court of Appeals in <u>Crosby</u> noted that a sentence that is neither within the applicable Guidelines range nor imposed pursuant to the departure authority in the Commission's policy statements should be called a "non-Guidelines sentence". The Court of Appeals cautioned sentencing courts not to consider the difference a "departure". According to the Court, a "departure," in the jurisprudence of the mandatory Guidelines regime, meant a sentence above or below the applicable Guidelines range when permitted under the standards governing departures. In contrast, under the FSA the sentencing court is not bound by the departure rules when it bases its decision on the other FSA factors.

With this discussion in mind, we now proceed to the applicability of mandatory minimum sentences and the non-mandatory Guidelines range, upon Egipciaco's sentencing.

### III.   Statutory Mandatory Minimum Sentences

21 U.S.C. §§ 846 and 841(a)(1) make it unlawful for "[a]ny person" to "knowingly or intentionally" "attempt[] or conspire[]" to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." The statutory mandatory minimum sentence for attempted distribution of 5 kg or more of cocaine is 10 years imprisonment. <u>See</u> 21 U.S.C. § 841(b)(1)(A). Due to Mr. Egipciaco's prior felony conviction, his mandatory minimum is increased to 20 years imprisonment. <u>Id.</u>

Although we recognize that 21 U.S.C. § 841(b)(1)(A) has withstood numerous previous challenges to its constitutionality, <u>see, e.g.</u>, <u>United States v. Moore</u>, 54 F.3d 92

(2d Cir. 1995); <u>United States v. Jackson</u>, 59 F.3d 1421 (2d Cir. 1995); <u>United States v. Stevens</u>, 19 F.3d 93 (2d Cir. 1994); <u>United States v. Haynes</u>, 985 F.2d 65, 70 (2d Cir. 1993); <u>United States v. Jackson</u>, 968 F.2d 158 (2d Cir. 1992), counsel is unaware of any previous challenge raised under the basis addressed herein: the disproportionality of treating real and manufactured drug conspiracies in the same manner for purposes of sentencing. Further, since <u>United States v. Booker</u>, <u>supra</u>, 543 U.S. 220, 125 S.Ct. 738 (2005), declared unconstitutional the mandatory provisions of the Sentencing Guidelines, we respectfully submit such should have extended to U.S.S.G. § 5G1.1, which – similar to the now excised 18 U.S.C. § 3553(b)(1) – incorporated mandatory sentencing requirements into the now advisory Sentencing Guidelines.

Defense counsel recognize that the Supreme Court has yet to address whether its plurality opinion in <u>Harris v. United States</u>, 536 U.S. 545, 556-68, 122 S.Ct. 2406, 2414-20 (2002) – that mandatory minimum sentences are not effected by <u>Apprendi</u> – is still valid in light of the growing opposition to this rule. However, we note that the Second Circuit recently placed further emphasis on the vulnerability of mandatory minimum sentences by ruling that judicial enhancements that increase the mandatory minimum sentence beyond what is found by a jury are indeed unconstitutional under the 5th and 6th Amendments. <u>See</u> <u>United States v. Sheikh</u>, 433 F.3d 905, 906 (2d Cir. 2006). Moreover, in light <u>Booker</u> and the growing dissatisfaction of mandatory minimum sentences, Mr. Egipciaco respectfully objects to reliance on the statutory minimum in determining his sentence, and submits that when applied to the facts of his case (<u>i.e.</u>, a police

manufactured drug conspiracy involving no quantity of "actual" narcotics), imposing the mandatory minimum sentence violates his Due Process rights.[3]

Disapproval of mandatory minimum sentences as a matter of policy was thoroughly reasoned by Justice Breyer:

> Mandatory minimum statutes are fundamentally inconsistent with Congress' simultaneous effort to create a fair, honest, and rational sentencing system through the use of Sentencing Guidelines. Unlike Guideline sentences, statutory mandatory minimums generally deny the judge the legal power to depart downward, no matter how unusual the special circumstances that call for leniency. See Melendez v. United States, 518 U.S. 120, 132-133, 116 S.Ct. 2057, 135 L.Ed.2d 427 (1996) (BREYER, J., concurring in part and dissenting in part); cf. Koon v. United States, 518 U.S. 81, 95-96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). They rarely reflect an effort to achieve sentencing proportionality – a key element of sentencing fairness that demands that the law punish a drug "kingpin" and a "mule" differently. They transfer sentencing power to prosecutors, who can determine sentences through the charges they decide to bring, and who thereby have reintroduced much of the sentencing disparity that Congress created Guidelines to eliminate. [See] U.S. Sentencing Comm'n, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System i-iv, 31-33 (1991) (Sentencing Report); see also Schulhofer, Rethinking Mandatory Minimums, 28 Wake Forest L. Rev. 199, 214-220 (1993). They rarely are based upon empirical study. See [Remarks of Chief Justice William H.] REHNQUIST, [Nat. Symposium on Drugs and Violence in America 9-10 (June 18, 1993)]; Hatch, [The Role of Congress in Sentencing: The United States Sentencing Commission, Mandatory Minimum Sentences, and the Search for a Certain and Effective Sentencing System, 28 Wake Forest L. Rev. 185, 198 (1993)]. And there is evidence that they encourage

---

[3]    As a threshold matter, we note that the proper standard to be applied to Mr. Egipciaco's Due Process argument is the "rational basis test," since Defendant does not allege intentional discrimination. See Minnesota State Bd. For Community Colleges v. Knight, 465 U.S. 271, 104 S.Ct. 1058 (1984); Rogers v. Lodge, 458 U.S. 613, 617 & n.5, 102 S.Ct. 3272, 3275 & n.5 (1982); Schweiker v. Wilson, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159 (1935) (arbitrary and unreasonable); United States v. Stevens, supra, 19 F.3d 93, 96 (2d Cir. 1994); United States v. Jackson, supra, 59 F.3d 1421, 1424 (2d Cir. 1995).

> subterfuge, leading to more frequent downward departures (on a random basis), thereby making them a comparatively ineffective means of guaranteeing tough sentences. <u>See</u> Sentencing Report 53.

<u>Harris</u>, 536 U.S. at 570-71, 122 S.Ct. at 2421 (Breyer, J., concurring in part and concurring in the judgment). Much like the view expressed in Justice Breyer's partial concurrence, Justice Thomas similarly expressed concern over the vitality of mandatory minimums: "According to the plurality, the historical practices underlying the Court's decision in <u>Apprendi</u> with respect to penalties that exceed the statutory maximum do not support extension of <u>Apprendi</u>'s rule to facts that increase a defendant's mandatory minimum sentence. Such fine distinctions with regard to vital constitutional liberties cannot withstand close scrutiny." <u>Harris</u>, 536 U.S. at 574, 122 S.Ct. at 2423 (Thomas, J., dissenting, joined by Stevens, J., Souter, J., and Ginsburg, J.).

Here, proportionality is clearly in doubt, since 21 U.S.C. § 841(b)(1)(A) requires that Mr. Egipciaco be punished just as severely for participation in a "manufactured" (or "imaginary") offense, as he would have been punished had the contemplated substantive offense been real. We respectfully submit that this disproportionality is a strong example of what Justice Breyer sought to condemn.

The next question is whether there is a rational basis in which to uphold 21 U.S.C. § 841(b)(1)(A), or whether, as applied to the instant matter, the sentencing scheme becomes arbitrary and unreasonable. We respectfully submit that the latter is the case.

18 U.S.C. § 3553(a)(2) explains that the primary purposes of sentencing are: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the

defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Likewise, the Supreme Court has long held that "punishment should fit the offender and not merely the crime," Williams v. New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083 (1949); see also Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647 (1989) (discussing purpose of Sentencing Reform Act and Sentencing Guidelines).

Although now merely advisory, the Sentencing Guidelines themselves remain intended to "provide certainty and fairness in meeting the purposes of sentencing by avoiding unwarranted disparity among offenders with similar characteristics convicted of similar criminal conduct, while permitting sufficient judicial flexibility to take into account relevant aggravating and mitigating factors." An Overview of the United States Sentencing Commission, June 2005, http://www.ussc.gov/general/USSCoverview.pdf; see also 28 U.S.C. § 991(b)(1)(B). Here, we have an instance where the conduct is merely similar on its face, and only the slightest of digging reveals the instant offense to be quite different that what was envisioned by the law.

The mandatory minimum sentences currently included in 21 U.S.C. § 841, were incorporated from the Narcotics Penalties and Enforcement Act of 1986, Pub. L. 99-570, Title I, Sec. 1001, Oct. 27, 1986, 100 Stat. 3207-2 (hereinafter, the "Penalties Act"), wherein Congress established harsher sentences for drug "kingpins" and "masterminds" than for mid and low-level drug dealers. While not clear from 21 U.S.C. § 841 itself, the targets of the Penalties Act can be unveiled by a review of the Act's legislative history. See United States v. James, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121-22 (1986) (when

legislative history is contrary to the language of a statute, trial courts may follow the legislative intent).

While arguing in favor of passage of the Penalties Act, several Senators made clear the purpose of the legislature. Senator Lawton Chiles, co-sponsor of the Bill, explained that the Penalties Act would impose "mandatory sentences and larger fines ... against major drug traffickers and kingpins." 132 Cong.Rec. § 14288 (daily ed. September 30, 1986). Senator Joseph Biden explained, "On the supply side, this package provides for stronger new penalties for most drug related crimes, including mandatory minimum penalties for the kingpins of the drug syndicates and for those who sell their poison to our children." 132 Cong.Rec. § 14289 (daily ed. September 30, 1986). Senator Byrd further explained, that mandatory minimum sentences are intended to be "applied to all the major drug dealers who are preying upon our society—upon our cities and towns, in both urban and rural areas, on folks from all walks of life, all age groups, and all income strata. We divided these major dealers into two groups for the purposes of fixing what the required jail terms should be: For the kingpins – the masterminds who are really running these operations, and they can be identified by the amounts of drugs with which they are involved – we require a jail term upon conviction." 132 Cong.Rec. § 14301 (daily ed. September 30, 1986). The Report of the House Judicial Committee notes that "the Committee selected quantities of drugs which if possessed by an individual would likely be indicative of operating at such a high level," however, the Report also makes clear that the Penalty Act targeted "major traffickers, the manufacturers or the heads of organizations." H.R.Rep. No. 99-845, 99th Cong., 2d Sess. 11-12 (1986).

The Government will surely concede that Egipciaco is not a cocaine manufacturer or head of a drug organization. Although the Government may disagree on whether Egipciaco was a major trafficker, the Government cannot dispute that no evidence was presented to establish such theory at trial, outside of the conduct involved in the specific charged offenses. However, the specific charged offenses were, of course, the product of a sting operation, and although Egipciaco may have been led to believe that drugs were involved, such was not actually the case. Indeed, for many it is difficult to fathom how a person could even be prosecuted for conspiracy to commit a crime that could never exist, although we do not dispute that the law on such issue is clear.

Obviously, the Narcotics Penalties and Enforcement Act was created to help curtail drug trafficking, but such is only hypothetically the result when applying the law to participants in sting operations such as existed in the present case. No doubt conspiracy is a crime in and of itself, but the legislative history does not establish a rational basis for penalizing a defendant for conspiracy to commit a fictitious crime in the same manner as conspiracy to commit an actual crime. Here, we respectfully submit that in rendering judgment the Court should be mindful that there were no actual drugs charged in the Indictment. No matter the wrongfulness of Mr. Egipciaco's conduct, the substantive crime could never have occurred and as such we submit that no rational basis can be found to sentence Mr. Egipciaco in the manner contemplated by the Penalty Act as incorporated by 21 U.S.C. §§ 841(b)(1)(A) and 846.

In a sentencing's most base form, the ultimate purpose is to protect the public from harm. In instances where no crime would have occurred if not for the Government's intervention, or where no substantive crime could have occurred despite

the Government's manufacturing of a conspiracy, the public is not at a similar risk as it would be were the crime to contain an element of substantive plausibility.

It is clear that the purpose of mandatory minimum sentencing was to punish drug "kingpins and masterminds" who were "major traffickers, the manufacturers or the heads of organizations." However, it is impossible to be a major trafficker or manufacturer of drugs that do not exist, stranger still to consider someone a kingpin, mastermind, or head of a narcotics organization, when the masterful conspiracy could never be fulfilled. As such, we respectfully submit that the Penalty Act was intended to punish offenders in a different class and for different conduct then present here. And we further submit that it would be disproportionate, and without a rational basis, to apply 21 U.S.C. § 841(b)(1)(A) to Mr. Egipciaco's class, conduct, and imposed sentence. Wherefore, based upon the above-stated reasons, we respectfully submit that statutory mandatory minimum sentences are unconstitutional as applied to the instant matter, and as such should not be applied when considering Mr. Egipciaco's sentence.

### IV.   Advisory Guideline Calculation

Mr. Egipciaco raises two objections to the advisory Guideline calculation proposed by the Probation Department in the Pre-Sentence Report ("PSR"). Mr. Egipciaco respectfully objects to the Probation Department's two-level enhancement for Role in the Offense with respect to Count 1, and also objects to the Probation Department's reliance on statutory mandatory minimums in calculating Mr. Egipciaco's non-mandatory Guideline range.

### A. Objection to Probation Department's enhancement for Egipciaco's Role in the Hobbs Act Conspiracy (Count 1)

The PSR states that Egipciaco "was an organizer and leader of the scheme to rob a drug dealer of his cocaine" and that "[t]his scheme included two other participants the defendant recruited to join him in committing this robbery" (PSR at ¶ 30). Defendant respectfully objects to the facts and conclusions stated in ¶ 30 of the PSR. The evidence presented at trial established without question that the instant offense was wholly planned and conceived by Jimmy Burgos, the Government's confidential source ("CS"), acting in conjunction and upon the instructions of the Drug Enforcement Agency ("DEA"). It was the CS that recruited Egipciaco to participate in the instant offense, it was the CS that instructed Egipciaco what was needed to proceed, and without question it was the CS that was the organizer and leader of the scheme. But see United States v. Garcia, 413 F.3d 201, 223-24 (2d Cir. 2005) (discussing requirements of enhancement for acting an organizer, leader, manager, or supervisor). As such, and although Mr. Egipciaco will be seeking a non-Guideline sentence, for purposes of an advisory Guideline calculation, we respectfully submit that Egipciaco's Adjusted Offense Level for Count 1 should not be enhanced for his "Role in the Offense".

### B. Objection to Probation Department's reliance on Statutory mandatory minimums when calculating Egipciaco's non-mandatory Guideline sentence

Egipciaco respectfully objects to reliance on mandatory minimums when calculating his non-mandatory (i.e., advisory) Guideline sentence. In light of the arguments addressed supra at Point III, and to preserve a clear trial record, we respectfully request that in calculating Egipciaco's advisory Guideline range, the Court calculate the advisory sentence without reliance on mandatory minimums.

## C.    Additional factors relevant to advisory Guideline range

Finally, in considering the non-mandatory Guideline range relevant to Mr. Egipciaco, it is important to remember that even when the Sentencing Guidelines had been mandatory, it "[did] not require a judge to leave compassion and common sense at the door to the courtroom."  United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995). Despite the "widespread but serious misconception" that the promulgation of the Guidelines enjoined sentencing courts from considering the personal characteristics of the offender, United States v. Rodriguez, 724 F.Supp. 1118, 1119 (S.D.N.Y. 1989), "it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines' glass bubble, and preventing it from exercising discretion, flexibility or independent judgment."  United States v. Lara, 905 F.2d 599, 604 (2d Cir. 1990).

## V.    Offense Conduct

In January 2005, Jimmy Burgos, a drug dealer who had entered into a cooperation agreement with the Government, approached an individual by the name of Junior and sought participants in a fictitious robbery scheme that had been manufactured by the DEA as part of a sting operation.  At the direction of the DEA, Burgos informed Junior that he was looking for people with robbery experience to assist him in robbing another drug dealer (in fact, a fictitious drug dealer) of eight kilograms of cocaine (which also did not in fact exist).  Junior referred Burgos to Egipciaco.

On February 2, 2005, Burgos had a meeting with Egipciaco, which was recorded by the police and later translated from Spanish into English.  During their meeting

Burgos explained that he wanted Egipciaco's assistance in robbing a Columbian drug dealer who they would rob of 8 kg of cocaine.

On February 3, 2005 at approximately 8:00 p.m., Burgos met up with Egipciaco at the corner of 14th Street and Ninth Avenue in Manhattan. They spoke inside a car that Egipciaco had driven to the location, and a third person, Leo Williamson, was seated in the backseat of the car. The conversation was recorded and again had entirely in Spanish. Williamson did not speak – and was never spoken to – during this meeting. During the conversation, Burgos and Egipciaco further discussed the robbery, and at one point Egipciaco gestured to Williamson to show Burgos a gun, which was quickly flashed to Burgos to show it was unloaded. Burgos never asked Williamson any questions regarding the robbery, not even to ask if he understood what was going on. On his own accord, Burgos then fabricated that the fictitious drug dealer would have an additional 2 kg of cocaine that they would rob.

Shortly after Burgos explained where the robbery was to occur, Egipciaco drove to the location and was immediately arrested. No other individuals were witnessed at the scene of the fictitious robbery, and as such only Egipciaco and Williamson were arrested and thereafter charged with conspiracy to commit the fictitious robbery, conspiracy to distribute the fictitious drugs, and related gun charges.

### VI.   Application of the Statutory § 3553(a) Factors to this Case

In the present case, the following factors should be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purpose of sentencing: (1) the nature of circumstances of the offense; and (2) the history and characteristics of the offender.

## A.    Nature and Circumstances of the Offense

As previously indicated, this case does not involve "actual" cocaine, but was merely the product of a sting operation wherein the DEA manufactured a conspiracy to rob and later distribute fictitious drugs.   Indeed, the case does not even involve an "actual" substantive robbery or distribution charge, since Mr. Egipciaco's acts were all undertaken in an effort to ultimately commit a fictitious crime.   Mr. Egipciaco was, admittedly, found guilty of two separate conspiracies and two related gun counts, all of which are quite real and quite serious offenses.   Indeed, the fictitious nature of the underlying substantive offenses does not diminish the wrongfulness of Egipciaco's conduct, but does, we submit, reflect on his culpability.

Further, we respectfully submit that the drug quantity in this case (five or more kilograms of cocaine) likewise fails to accurately reflect the culpability of Mr. Egipciaco. Drug quantity is not always an "entirely appropriate proxy for culpability."   United States v. Jaber, 362 F.Supp.2d 365, 380 (D.Mass. 2005) (Gertner, J.).   As Judge Gertner noted, "drug quantity may well be a kind of accident, depending on the fortuities of law enforcement or even the market, as much as it reflects the defendant's culpability." Jaber, 362 F.Supp.2d at 380.   As similarly noted by Judge Lynch in a fraud case, "In many cases … the amount stolen is a relatively weak indication of the moral seriousness of the offense or the need for deterrence."   United States v. Emmenegger, 397 F.Supp 2d 416, 427 (S.D.N.Y. 2002).

## B.    History and Characteristics of Daniel Egipciaco

Daniel Egipciaco, who is only 25 years old, candidly shared the circumstances of his upbringing with the Department of Probation.   He is the second of three children,

whose parents separated when he was 12. After his parents separated his mother left the household and moved to Florida for approximately one year. During this time Egipciaco was looked after by his father, who had been recently released from prison, and then by his aunt, Anna Felipe, after his father could not support the household.

Egipciaco explained to the Department of Probation that he had his first taste of alcohol when he was 18 years old, and drank once or twice per month until his incarceration for the instant offense. Egipciaco admitted that although he did not begin drinking until his late teens, he began using marihuana when he was only 12, shortly after his parents separated. By the time he was 17 or 18, his marihuana use became a daily habit, although by the time he was 21 he was able to reduce his habit slightly to two or three times per week. Like too many other young men in his position, Egipciaco also experimented with cocaine, but never tried any other form of controlled substances.

Realizing, however, that he had a drug addiction, Egipciaco enrolled himself in a residential drug treatment program at Pride Site (also referred to as Education Alliance), a drug treatment program located in Manhattan. He was enrolled in the program from October 2001 through January 2003, and had entered the program in an effort to change his life and end his addiction. During his time in the drug treatment program, Egipciaco obtained a commercial driver's license and was able to obtain his own apartment after graduating. He also tested negative for all controlled substances while under interim supervision with the New York City Department of Probation from October 8, 2002 through April 2003.[4] After he graduated from the drug treatment program he was able to stay clean of drugs for one year, but then lapsed back into marijuana use thereafter, a fact

---

[4]     We note that Mr. Egipciaco entered the Pride Site drug treatment program voluntarily and one year prior to being placed on probation. Indeed, he was given probation, as opposed to a sentence of incarceration, specifically because he had received favorable reports from the drug treatment program.

that was conceded by Mr. Egipciaco even though he has not tested positive for marijuana use since 2001.

Despite Egipciaco's struggle with addiction, he has always been extremely bright. He graduated from Thomas A. Edison High School, located in Jamaica, New York, majoring in electrical installation and reportedly earned a 100 average in that subject. Indeed, Egipciaco was nearly a straight "A" student and was on the honor roll while in high school, and also completed two semesters at Baruch College in Manhattan.

Prior to his arrest Egipciaco had set up a music studio in his then-girlfriend, Ilene Gonzalez's, apartment, where he recorded music. He is also co-author of a screenplay entitled, "That Depends On You." Since being incarcerated for the present offenses, Egipciaco continues to work on writing projects and is trying to remain productive. As he explained to the Department of Probation, his goals upon his eventual release are to obtain a real estate license and to pursue a degree at the Institute of Audio Research in recording engineering.

Although young, Egipciaco has held several different jobs. From 2004 until his arrest for the instant offense, Egipciaco was employed as a driver for Diversified Beverage, located in Brooklyn. Prior to that, from 2003 to 2004, Egipciaco was a driver for Snapple Beverages, located in Long Island, and has also been employed as an Assistant Controller of Big Geyser, Inc., located in Flushing, New York, and was employed as a mentor and tutor for the New York City Board of Education, working with special education students for three school years. Indeed, Egipciaco has always worded hard and obtained his first jobs at the age of 13, working in pizzerias and having a paper route.

Over the years Egipciaco relationship with his family greatly improved. Despite mostly loosing contact with his father, Egipciaco grew quite close to his mother, Alida Egipciaco. According to Egipciaco's mother, Egipciaco was ultimately "raised in a tight family nest and religious community" (see letter from Alida Egipciaco, attached hereto as Exhibit A). "Although he is quite young he has proved good work ethics and responsibility for his family." Id. His mother describes him as, "an intelligent individual with great ideas for a promising future," who she is "confident … can make a worthwhile contribution to society if given the opportunity." Id. Most importantly, she confirms that Egipciaco has a "family that loves and supports him waiting for him." Id.

Egipciaco's aunt, Anna Felipe, speaks equally highly of him. She explains that Egipciaco "flourished into an exceptional young man with excellent grades in school and the hopes of a great future. He attempted to go to college[,] however, family finances kept him from continuing his education" (see letter from Anna Felipe, attached hereto as Exhibit B). Ms. Felipe explains that Egipciaco "was raised with integral family and religious values … [and] … the predicament Daniel finds himself in with the law does not depict his character." Id. Ms. Felipe further states that she "can truly and honestly say that [she] vouch[es] for this young man's character and integrity" and asks that this Court "take into consideration the potential he has if given the opportunity to turn his life around." Id.

Egipciaco's older brother, Reinaldo Egipciaco, Jr., also writes to "plead for any leniency the court and your honor can show toward Daniel in his sentencing" (see letter from Reinaldo Egipciaco, Jr., attached hereto as Exhibit C). Egipciaco's brother explains, "Like many of us [Egipciaco] has made some very poor choices. Daniel let his

path get altered and now has to deal with the consequences. I clearly understand the seriousness of the charges my brother was found guilty of. I also know that the outcome has changed our lives a great deal. Daniel has yet to reach his potential and he still has a lot to offer the community. He has a family that loves and supports him[, and] will always have somewhere to come out to." Id.

Egipciaco undoubtedly has the family support to turn his life around. His younger brother and close cousins are all attending school, thanks greatly to Egipciaco's encouragement (see Exhibit B). His ex-girlfriend, who he remains close to, is employed as a registered nurse and is attending graduate school to obtain a master's degree in nursing and anesthesiology. Egipciaco also has the support of family friends.

Rev. Paul W. Jervis, Pastor of the St. Paul the Apostle Church in Corona, New York, writes that "notwithstanding the matter he has been charged with, Daniel is a very production young man who has much to offer to his society and is not at all anti-social in any manner" (see letter from Rev. Paul W. Jervis, attached hereto as Exhibit D). Angie Bonilla, a close friend and former co-worked of Egipciaco's mother, also writes in support of Egipciaco's character and the need to consider leniency. She describes Egipciaco as "an intelligent, level-headed person [who] has found himself to be in a predicament out of character with the values with which he has been raised" (see letter from Angie Bonilla, attached hereto as Exhibit E). Acknowledging the severity of Egipciaco's crimes she pleads with the Court "to please consider the enormity of the sentence that is being handed down to someone so young. Although I do not want to lessen the severity of the crimes that w[ere] intended, I am pleading for empathy." Id. Ms. Bonilla beseeches the Court to "exercise your power and hand down the fairest

sentence you deem acceptable," and asks that the Court "possibly give a break to a young man that comes from a good family." Id. Ms. Bonilla then concludes that she is "sure that he has learned a lesson and with his family behind him the chance of him getting into any more trouble is … unlikely." Id.

## VII.   Reasons for a Non-Guideline Sentence under 18 U.S.C. § 3553(a)

We respectfully submit that the history and character of this defendant does not warrant an advisory Guideline range of 151-188 (a figure that does not include the statutory minimum sentence of 240 months, nor the additional 60 months required by the conviction on Count 3).

Unlike many defendants convicted of a narcotics violation, Mr. Egipciaco has educational skills that will allow him to gain legal employment, and shares the support of a loving family and their friends. Mr. Egipciaco has written a play and was developing a career as a record producer at the time of his arrest. Mr. Egipciaco also realizes the good fortune of a strong, loving, supportive family and friends, and, importantly, he realizes that he possess the intelligence and skills that will permit him to be lawfully employed without resorting to future illegal activity.

The profile of this defendant, including the nature of circumstances of the offenses and the history and characteristics of Mr. Egipciaco, demonstrates that a sentence of less than 300 months (or for that matter less than 151 months) would best serve the interest of justice and constitute a reasonable sentence under the factors pursuant to 18 U.S.C. § 3553(a).

## VIII. <u>Conclusion</u>

Wherefore, based upon the above-stated reasons, we respectfully request that the Court conclude that mandatory minimum sentencing is unconstitutional as applied to this case, and likewise grant a lenient non-Guideline sentence.

Dated: New York, New York
     May 8, 2006

Respectfully submitted,


_____/S/_____
RICHARD JASPER

– On the brief –
Richard Jasper, Esq. (RJ-7559)
Michael K. Bachrach, Esq. (MKB-4798)

<u>**Certificate of Service**</u>

I, Michael K. Bachrach, hereby certify that I am not a party to the action, am over eighteen years of age, and reside in New York, New York. I further certify that on May 8, 2006, a true and correct copy of the Defendant Daniel Egipciaco's Memorandum of Law Regarding Sentencing was served electronically via ECF to the attorney for the government, named below.

AUSA Harry Sandick
U.S. Attorney's Office for the
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

Dated: New York, New York
      May 8, 2006

_____/S/_____
MICHAEL K. BACHRACH