UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

        - v. -          :

DANIEL EGIPCIACO, and          :          05 Cr. 202 (JGK)
LEO WILLIAMSON

                     :

              Defendants.

                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANT EGIPCIACO'S SENTENCING MEMORANDUM</u>

<br/>

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
    of America

HARRY SANDICK
NEIL M. BAROFSKY
Assistant United States Attorneys,
    Of Counsel.

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Presentence Investigation Report . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT:

Egipciaco Should Be Sentenced To Not Less Than 300 Months' Imprisonment

    A.    Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    Sentencing After *Booker* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.    The Constitutionality Of Mandatory Minimum Sentences . . . . . . . . . . . 8

        3.    Proportionality Of Sentences Under The Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        1.    A Mandatory Minimum Sentence For Egipciaco Remains Constitutional After *Booker* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        2.    Egipciaco's Mandatory Minimum Sentence Does Not Amount To Cruel And Unusual Punishment . . . . . . . . . . . . . . . . . . . . . 22

        3.    The Probation Office Properly Calculated Egipciaco's Guidelines Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        4.    Even If Permitted, Nothing In Section 3553(a) Supports A Non-Guidelines Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

## CASES

*Apprendi* v. *New Jersey*,
    530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 21

*Blakely* v. *Washington*,
542 U.S. 296 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

*Chapman* v. *United States*,
500 U.S. 453 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19, 20

*Ewing* v. *California*,
538 U.S. 11 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Harmelin* v. *Michigan*,
501 U.S. 957 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Harris* v. *United States*,
536 U.S. 545 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 28

*Hutto* v. *Davis*,
454 U.S. 370 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 24, 27

*Lockyer* v. *Andrade*,
538 U.S. 63 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 18, 24

*McMillan* v. *Pennsylvania*,
477 U.S. 79 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mistretta* v. *United States*,
488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20

*Rummel* v. *Estelle*,
445 U.S. 263 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 24, 25, 27

*Solem* v. *Helm*,
463 U.S. 277 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 27

*Sorrells* v. *United States*,
287 U.S. 435 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Terrebonne* v. *Butler*,
848 F.2d 500 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Archer*,
486 F.2d 670 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Barajas-Avalos*,
377 F.3d 1040 (9th Cir. 2004), *cert. denied*, 543 U.S. 1188 (2005) . . . . . . . . . . . . . . . . . . 18

*United States* v. *Barrero*,
425 F.3d 154 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States* v. *Booker*,
543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 6, 9

*United States* v. *Brinkworth*,
68 F.3d 633 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Cherry*,
433 F.3d 698 (10th Cir. 2005), *cert. denied*,
126 S. Ct. 1930 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Coleman*,
166 F.3d 428 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Collado-Gomez*,
834 F.2d 280 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Crosby*,
397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States* v. *Dyck*,
287 F. Supp. 2d 1016 (D.N.D. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Estrada*,
428 F.3d 387 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 1451, 1454 (2006) . . . . . . . . . . . 10, 21

*United States* v. *Fernandez*,
443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States* v. *Garcia*,
413 F.3d 201 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States* v. *Gonzalez*,
407 F.3d 118 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Gonzalez*,
420 F.3d 111 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Greenfield,*
    44 F.3d 1141 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Hildenbrandt,*
    378 F. Supp. 2d 44 (N.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Holguin,*
    436 F.3d 111 (2d Cir. 2006), *petition for cert. filed,* 05-10760 (U.S. Apr. 25, 2006) . . . . . . 10

*United States* v. *Huerta,*
    878 F.2d 89 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States* v. *Jackson,*
    59 F.3d 1421 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States* v. *Jones,*
    418 F.3d 726 (7th Cir. 2005), *cert. denied,* 126 S. Ct. 817 (2005) . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Knight,*
    96 F.3d 307 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Labrada-Bustamante,*
    428 F.3d 1252 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Leonard,*
    37 F.3d 32 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Pineda,*
    847 F.2d 64 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Raad,*
    406 F.3d 1322 (11th Cir.), *cert. denied,* 126 S. Ct. 196 (2005) . . . . . . . . . . . . . . . . . . . . . . 11

*United States* v. *Rubenstein,*
    403 F.3d 93 (2d Cir.), *cert. denied,* 126 S. Ct. 388 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States* v. *Snype,*
    441 F.3d 119 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Valdez,*
    16 F.3d 1324 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*United States* v. *Vaughn*,
430 F.3d 518 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 1665 (2006) . . . . . . . . . . . . . . . . . 8, 30

*United States* v. *Vizcaino*,
870 F.2d 52 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*United States* v. *Yousef*,
327 F.3d 56 (2d Cir.), *cert. denied*, 540 U.S. (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES, GUIDELINES AND OTHER AUTHORITIES

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 841(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21, 22, 26

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S.S.G. § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Gerard E. Lynch, *Sentencing Eddie*, 91 J. Crim. L. & Criminology 547 (2001) . . . . . . . . . . . . 28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

         - v. -          :

DANIEL EGIPCIACO, and          :          05 Cr. 202 (JGK)
LEO WILLIAMSON

                          :

           Defendant.

                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANT EGIPCIACO'S SENTENCING MEMORANDUM</u>

The Government respectfully submits this letter in opposition to Egipciaco's sentencing

memorandum dated May 8, 2006 ("Mem."). In this motion, Egipciaco asks the Court to ignore

settled law and to refuse to impose a mandatory minimum sentence. He asks instead that the

Court "grant a lenient non-Guidelines sentence." (Mem. 27).

Egipciaco's request should be denied. Egipciaco committed offenses that carry validly

enacted mandatory minimum penalties. Nothing in *United States* v. *Booker*, 543 U.S. 220

(2005), affects the validity of the mandatory minimum sentencing regime created by Title 21,

United States Code, Section 841(b)(1) ("Section 841(b)(1)"), and absolutely no precedent

supports Egipciaco's argument. Indeed, the Eighth Amendment jurisprudence of the Supreme

Court and the Second Circuit squarely contradicts Egipciaco's position. This Court should

follow the law and impose a 300-month mandatory minimum sentence, as recommended in the

Presentence Investigation Report. (PSR ¶ 105).

# BACKGROUND

## A.    The Offense Conduct

At trial, the Government presented strong evidence that Daniel Egipciaco and co-defendant Leo Williamson together agreed to rob a Colombian drug dealer, at gunpoint, of 8 to 10 kilograms of cocaine, intending to distribute the cocaine to others after the robbery.[1]  (PSR ¶¶ 11-22).  The robbery was to happen on the night of February 3, 2005, at a McDonald's restaurant on 34th Street and 10th Avenue in Manhattan.  (PSR ¶ 20).  Egipciaco and Williamson arrived at the location with a firearm with an obliterated serial number, a ski mask, hats, and three sets of gloves, equipment that Egipciaco and Williamson would have used to carry out the robbery.  (PSR ¶ 22).

In fact, unbeknownst to Egipciaco and Williamson, there was no Colombian drug dealer to be robbed that night.  (PSR ¶¶ 11-12).  Egipciaco and Williamson were arrested as part of a robbery sting conducted by the REDRUM group of the New York Drug Enforcement Task Force, which is comprised of members of the Drug Enforcement Administration, the New York City Police Department, and the New York State Police.  (PSR ¶ 11).  Prior to his arrest, Egipciaco had participated in two recorded meetings and one recorded telephone call with a confidential informant, Jimmy Burgos, who was acting on the instructions of agents and detectives.  (PSR ¶¶ 13-21).  In these recorded conversations, Egipciaco told the CI that he was prepared to rob the Colombian drug dealer of as much as 10 kilograms of cocaine and that he planned to redistribute the drugs to others.  (PSR ¶¶ 13, 15, 18).

---

[1]  The Government also relies on the facts as set forth in the Court's Memorandum and Order, dated April 7, 2006, denying the defendant's post-trial motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

After approximately four hours of deliberations, the jury returned a guilty verdict on Count One (conspiracy to commit armed robbery, in violation of the Hobbs Act, Title 18, United States Code, Section 1951), Count Two (conspiracy to distribute 5 and more kilograms of cocaine, in violation of Title 21, United States Code, Section 846), Count Three (using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, the armed robbery conspiracy charged in Count One, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii)), and Count Six (possession of a firearm after a felony conviction, in violation of Title 18, United States Code, Section 922(g)).   The jury acquitted Egipciaco on Count Four (assault of a federal officer, in violation of Title 18, United States Code, Section 111) and Count Five (possession of a firearm with an obliterated serial number, in violation of Title 18, United States Code, Section 922(k)).[2]

**B.      The Presentence Investigation Report**

Since Egipciaco's conviction, the United States Probation Office ("Probation Office") has prepared a Presentence Investigation Report ("Presentence Report" or "PSR") that sets forth Sentencing Guidelines calculations for Egipciaco.  The Probation Office treated the convictions on Counts One, Two and Six as separate groups, with Count Three requiring a 60-month sentence of imprisonment to run consecutive to the term of imprisonment imposed on the other counts of conviction.

---

[2]  This charge was originally contained in Count Five of Indictment 05 Cr. 202 (JGK), but was redesignated as Count Six when it was presented to the jury in a bifurcated, second phase of the trial.  The original Count Six, the obliterated serial number count, was redesignated as Count Five.

Group One consists of the Hobbs Act conspiracy count. The Probation Office has recommended the following calculations: that the base offense level is 20, pursuant to U.S.S.G. § 2B3.1(a); that there be a one-level enhancement because the object of the robbery was a controlled substance, pursuant to U.S.S.G. § 2B3.1(b)(6); and that there be a two-level enhancement for Egipciaco's role in the offense, pursuant to U.S.S.G. § 3B1.1(c), leading to an adjusted offense level of 23 for Group One. Group Two consists of the narcotics conspiracy count, and the Probation Office recommended that the offense level is 32, because the defendant conspired to distribute between 5 and 15 kilograms of cocaine, pursuant to U.S.S.G. § 2D1.1(c)(4). Group Three consists of the felon-in-possession count, and the Probation Office recommended that the offense level is 20, because the defendant had sustained a prior conviction for a controlled substances offense, pursuant to U.S.S.G. § 2K2.1(a)(4)(A).

The Probation Office then conducted a multiple unit analysis pursuant to U.S.S.G. § 3D1.4, and determined that Egipciaco's total offense level was 22. (PSR ¶ 55). The Probation Office also reviewed Egipciaco's criminal history, and determined that he was in Criminal History Category III based on his two prior criminal convictions (one of which was for his sale of cocaine to an undercover detective). (PSR ¶¶ 56-67). The Probation Office therefore determined that Egipciaco's Guidelines range for Counts One, Two and Six was 151 to 188 months' imprisonment. However, the Probation Office recognized that Egipciaco faced a 240-month mandatory minimum sentence on Count Two because the Government filed a prior felony information before trial. (PSR ¶ 105). Moreover, because Egipciaco faced a 60-month consecutive sentence on Count Three, his total mandatory minimum sentence is 300 months' imprisonment. (PSR ¶ 105).

## ARGUMENT

**Egipciaco's Should Be Sentenced To Not Less Than 300 Months' Imprisonment**

**A.      Applicable Legal Standards**

**1.      Sentencing After *Booker***

In *United States* v. *Booker*, 543 U.S. 220, 226 (2005), a five-member majority of the Supreme Court concluded that the Sixth Amendment principles announced in *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000), and *Blakely* v. *Washington*, 542 U.S. 296 (2004), apply to the Sentencing Guidelines.  Specifically, in its opinion authored by Justice Stevens, the Supreme Court held that any fact (other than a prior conviction) that is "necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted to the defendant or proved to a jury beyond a reasonable doubt."  543 U.S. at 244.

A different five-member majority, led by Justice Breyer, ruled that the appropriate remedy for the Sixth Amendment problem described in Justice Stevens's majority opinion was to sever from the Sentencing Reform Act 18 U.S.C. §§ 3553(b)(1) and 3742(e), and treat the Guidelines as advisory rather than mandatory.  543 U.S. at 245-46.  Under the Court's opinion, while the Sentencing Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  543 U.S. at 252.  In furtherance of that goal, judges are required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the

pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." *Id.* at 259-60.

In sentencing defendants, district courts must consider not only the Guidelines but also the other factors set forth in Title 18, United States Code, Section 3553(a) ("Section 3553(a)"). Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations that district courts must take into account at sentencing:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—
(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant;
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)    any pertinent policy statement [issued by the Sentencing Commission];

(6)     the need to avoid unwarranted sentence disparities among
        defendants with similar records who have been found guilty
        of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

In light of *Booker*, the Second Circuit has held that district courts should now engage in a three-step sentencing procedure. *See United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). First, the district court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112. Second, the district court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113

The Guidelines still play a central role in sentencing. Although the Sentencing Guidelines are no longer mandatory, the Second Circuit has instructed district judges to consider them "faithfully" when sentencing. *Crosby*, 397 F.3d at 114. Indeed, the Second Circuit has explained that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States* v. *Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006). In this vein, the Second Circuit has also held that the Guidelines range for a particular defendant is "a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir.), *cert. denied*, 126 S. Ct. 388 (2005). This is

not surprising, given that the Guidelines reflect the "accumulated wisdom and experience of the Judicial Branch." *Mistretta* v. *United States*, 488 U.S. 361, 412 (1989).

As the Second Circuit has repeatedly made clear, "district courts remain statutorily obliged to calculate Guidelines ranges in the same manner as before *Booker* and to find facts relevant to sentencing by a preponderance of the evidence." *United States* v. *Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005) (findings based on preponderance acceptable even with regard to acquitted conduct), *cert. denied*, 126 S. Ct. 1665 (2006). A sentencing court is expressly *not* bound by only those facts admitted in a plea allocution or found by a jury. Indeed, the Second Circuit has stated that doing just that is error: "a sentencing judge would also violate section 3553(a) by limiting consideration of the applicable Guidelines range to the facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range, as required by subsection 3553(a)(4), based on the facts found by the court." *Crosby*, 397 F.3d at 115.

**2.      The Constitutionality Of Mandatory Minimum Sentences**

It is well established that Congress "has the power to fix the sentence for a federal crime, and the scope of judicial discretion with respect to a sentence is subject to congressional control." *Mistretta* v. *United States*, 488 U.S. at 364 (citation omitted) (citing *United States* v. *Wiltberger*, 18 U.S. (5 Wheat) 76 (1820), and *Ex Parte United States*, 242 U.S. 27 (1916)). In fact, the law is clear that "Congress has the power to define criminal punishments without giving the courts *any* sentencing discretion." *Chapman* v. *United States,* 500 U.S. 453, 467 (1991) (emphasis added). As the Supreme Court has noted, "[d]eterminate sentences were found in this country's penal codes from its inception," and a "sentencing scheme providing for 'individualized sentences rests

not on constitutional commands, but on public policy enacted into statutes.'" *Id*. (citations

omitted) (quoting *Lockett* v. *Ohio*, 438 U.S. 586, 604-05 (1978) (plurality opinion)).

Based on these principles, this Court has rejected arguments that, like Egipciaco's

argument here, attack the constitutionality of the mandatory minimum sentence as sufficiently

unfair so as to deny due process to the defendant. For example, in *United States* v. *Huerta*, 878

F.2d 89 (2d Cir. 1989), the Second Circuit upheld the imposition of a mandatory minimum

sentence rejected such a due process Clause claim. The defendant in that case argued that the

mandatory minimum sentence violated his Due Process Clause rights because it prevented him

from receiving an individualized sentence. The Court rejected that argument, holding that "there

is no right to individualized sentencing, and that Congress may constitutionally prescribe

mandatory sentences or otherwise constrain the exercise of judicial discretion, so long as such

constraints have a rational basis." 878 F.2d at 94.

The long-standing principle that Congress can constitutionally limit a court's sentencing

discretion has not been affected in any way by the Supreme Court's decisions in *Apprendi* v. *New

Jersey*, 530 U.S. 466 (2000), *Blakely* v. *Washington*, 542 U.S. 296 (2004), and *United States* v.

*Booker*, 543 U.S. 220 (2005). Those cases involved Sixth Amendment challenges to the practice

of basing sentencing ranges upon judge-made findings of fact; nowhere do those decisions even

imply that Congress cannot impose mandatory minimum sentences upon an appropriate jury

finding.

Indeed, the continued constitutionality of mandatory minimum sentences has been

upheld, post-*Booker*, by this Court. In *United States* v. *Barrero*, 425 F.3d 154, 158 (2d Cir.

2005), the Court upheld imposition of a mandatory minimum sentence, rejecting a Sixth

Amendment challenge to a district court's finding that a defendant was not entitled to "safety valve" relief pursuant to 18 U.S.C. § 3553(f):

> the court's decision to sentence the defendant at an otherwise applicable statutory minimum pursuant to section 841 did not 'remove from the jury the assessment of facts that increase the prescribed range of penalties to which [the] . . . defendant is exposed.' *United States* v. *Gonzalez*, 420 F.3d 111, 123 (2d Cir. 2005). No portion of the defendant's punishment depends on facts, other than facts of prior convictions, that have not been authorized by a plea of guilty or a jury verdict. There is therefore no constitutional bar to a legislative instruction to a judge to sentence the defendant to such a mandatory minimum where, as here, the defendant is ineligible for safety valve relief based on the court's finding that he had more than one criminal history point.

425 F.3d at 158; *see United States* v. *Holguin*, 436 F.3d 111 (2d Cir. 2006) (affirming imposition of mandatory minimum based on district court finding by a preponderance that defendant was not entitled to "safety valve" because he was a supervisor), *petition for cert. filed*, 05-10760 (U.S. Apr. 25, 2006); *United States* v. *Estrada*, 428 F.3d 387, 391 (2d Cir. 2005) (upholding mandatory life sentence based on judge-based finding of prior narcotics convictions), *cert. denied*, 126 S. Ct. 1451, 1454 (2006); *see also United States* v. *Cherry*, 433 F.3d 698, 702 (10th Cir. 2005) (argument "that *Booker* renders statutory mandatory minimum sentences unconstitutional" is "foreclosed by this Circuit . . . as well as every other circuit to consider the issue"), *cert. denied*, 126 S. Ct. 1930 (2006); *United States* v. *Jones*, 418 F.3d 726, 727 (7th Cir. 2005) (*Booker* "did not alter *Harris's* treatment of statutory mandatory minimums"), *cert. denied*, 126 S. Ct. 817 (2005); *United States* v. *Labrada-Bustamante*, 428 F.3d 1252, 1265 (9th Cir. 2005) (rejecting 8th Amendment challenge to 20-year mandatory minimum, noting that "mandatory minimum sentencing schemes have been consistently upheld against constitutional

challenge" (internal quotation omitted)); *United States* v. *Raad*, 406 F.3d 1322, 1323 n.1 (11th Cir.) ("no merit" to defendant's contention that imposition of mandatory minimum sentence is unconstitutional in light of *Booker*), *cert. denied*, 126 S. Ct. 196 (2005).

In short, mandatory minimum sentences have repeatedly and consistently been held to be fully consistent with *Booker*. These courts have all agreed that nothing in *Booker* requires a reassessment of the long-established rule that Congress can permissibly limit judicial sentencing discretion by mandating minimum sentences.

### 3. Proportionality Of Sentences Under The Eighth Amendment

The Eighth Amendment provides, in relevant part, that "cruel and unusual punishments [shall not] be inflicted." With respect to terms of imprisonment, the Eighth Amendment, "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin* v. *Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in judgment). In a line of cases including the recent, companion opinions in *Ewing* v. *California*, 538 U.S. 11 (2003), and *Lockyer* v. *Andrade*, 538 U.S. 63 (2003), the Supreme Court has applied a "narrow proportionality principle" to claims that terms of years of imprisonment (as contrasted with the penalty of death) violate the Eighth Amendment. *Ewing*, 538 U.S. at 20 (plurality opinion) (quoting *Harmelin*, 501 U.S. at 996 (Kennedy, J., concurring)).

Both *Harmelin* and *Ewing* are decisions of five members of the Supreme Court, and in both cases, the defendants' claims were rejected over the dissents of four justices. Although five justices concurred in each of the Court's judgments, each five justice-majority reflected differing understandings of proportionality review of sentences of imprisonment.

For example, in both *Harmelin* and *Ewing*, Justice Scalia set forth his view that there is essentially no proportionality review of sentences of imprisonment. *Harmelin*, 501 U.S. at 994; *Ewing*, 538 U.S. at 31-32. Chief Justice Rehnquist joined Justice Scalia's opinion in *Harmelin*; in *Ewing*, Justice Thomas concurred in the judgment through a separate opinion setting forth his view that the Eighth Amendment "contains no proportionality principle." 538 U.S. at 32.

In contrast, in *Harmelin*, Justices Kennedy, O'Connor and Souter, recognizing the tension among some of the Supreme Court's prior Eighth Amendment cases, set forth "some common principles that give content to the uses and limits of proportionality review" of sentences of imprisonment. 501 U.S. at 998. Those four principles are:

> (1) the primacy of the legislature;
> (2) the variety of legitimate penological schemes;
> (3) the nature of our federal system; and
> (4) that proportionality review be guided by objective factors.

*Harmelin*, 501 U.S. at 998-1001. The plurality continued:

> All of these principles . . . inform the final one: The Eighth
> Amendment does not require strict proportionality between crime
> and sentence. Rather, it forbids only extreme sentences that are
> "grossly disproportionate" to the crime.

*Id*. at 1001 (quoting *Solem* v. *Helm*, 463 U.S. 277, 288 (1983).

The three justices then described the analysis to be applied to such claims. The first inquiry is a consideration of the seriousness of the offense and the punishment imposed. *Id*. at 1004. If such a comparison leads to "an inference of gross disproportionality," *id*. at 1005, the reviewing court is to conduct a "comparative analysis within and between jurisdictions;" that is, consideration of the punishment imposed for similar crimes in other jurisdictions, and the other types of crimes that yield the same sentence in the relevant jurisdiction. *Id*. at 1004-05.

In *Harmelin*, the Supreme Court denied petitioner's Eighth Amendment challenge to his sentence of life imprisonment without the possibility of parole for possession of 650 grams of cocaine by a first-time offender. *Id*. at 996. The plurality found that the sentence did not create an inference of gross disproportionality, and therefore did not proceed to conduct any interjurisdictional or intrajurisdictional comparisons. *Id*. at 1005.

The four dissenting justices in *Harmelin*—Justices White, Blackmun, Stevens and Marshall—filed three separate opinions. Justices White, Blackmun and Stevens rejected the view of the plurality that a reviewing court should only engage in interjurisdictional and intra-jurisdictional comparisons *after* finding an inference of gross disproportionality based upon a comparison of the offense conduct and the penalty. 501 U.S. at 1019. Rather, the three justices explained that three factors must be considered: "the gravity of the offense and the harshness of the penalty," . . . "the sentences imposed on other criminals in the same jurisdiction," . . . and "the sentences imposed for commission of the same crime in other jurisdictions." *Id.* (quoting *Solem*, 463 U.S. at 290-92).[3]

In *Ewing*, the five justice-majority held that a 25-year sentence applied under California's "three strikes" law and imposed on a defendant convicted of stealing approximately $1200 worth of golf equipment did not violate the Eighth Amendment. In addition to the offense of conviction, Ewing had "served nine separate terms of incarceration, and committed most of his crimes while on probation or parole." *Ewing*, 538 U.S. at 30.

---

[3] Justice Marshall wrote separately to set forth his view that the death penalty was unconstitutional. 501 U.S. at 1027-28.

As noted above, Justices Scalia and Thomas explained in *Ewing* their view that there is essentially no proportionality review of a sentence of a term of imprisonment. Justice O'Connor, joined by Justice Kennedy and Chief Justice Rehnquist, adopted much of the reasoning of the *Harmelin* plurality. For example, the *Ewing* plurality first set forth its view that a "narrow proportionality principle . . . applies to noncapital sentencing." *Ewing*, 538 U.S. at 20 (quoting *Harmelin*, 501 U.S. at 996-97). The *Ewing* plurality "first address[ed] the gravity of the offense compared to the harshness of the penalty." 538 U.S. at 28. The opinion made clear, moreover, that a proper analysis of a penalty imposed under laws providing increased punishment for recidivists required recognition of the defendant's criminal history.

The plurality explained:

> In weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism. Any other approach would fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions. In imposing a three strikes sentence, the State's interest is not merely punishing the offense of conviction, or the "triggering" offense: it is in addition the interest . . . in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law. To give full effect to the State's choice of this legitimate penological goal, our proportionality review of Ewing's sentence must take that goal into account.

*Ewing*, 538 U.S. at 29 (citations and quotations omitted).

The plurality then determined that

> Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by his own long, serious criminal record. Ewing has been convicted of numerous misdemeanor and felony offenses, served nine separate terms of incarceration, and committed most of his

crimes while on probation or parole. His prior "strikes" were serious felonies including robbery and three residential burglaries. To be sure, Ewing's sentence is a long one. But it reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated. The State of California was entitled to place upon [Ewing] the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State.

*Ewing*, 538 U.S. at 29-30 (citations, quotations and footnote omitted). Having so found, the plurality concluded that "Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross proportionality.'" 538 U.S. at 30 (quoting *Harmelin*, 501 U.S. at 1005).

In rejecting Ewing's challenge, the plurality relied heavily on *Rummel* v. *Estelle*, 445 U.S. 263 (1980). In *Rummel*, the Supreme Court denied an Eighth Amendment challenge to a life sentence, with possibility of parole, imposed by a Texas court. Rummel had been convicted of theft, and his sentence was enhanced under a recidivism statute as a result of two prior felony convictions. 445 U.S. at 285. Rummel's prior crimes consisted of fraudulent use of a credit card through which he obtained approximately $80 worth of goods and services, and for which he received a sentence of three years' imprisonment, *id.* at 265, and passing a forged check in the amount of $28.36 for which he received a sentence of four years' imprisonment. *Id.* at 266. His offense of conviction was obtaining $120.75 by false pretenses. Rejecting Rummel's challenge to his life sentence, the Supreme Court emphasized the purpose of the recidivism statute pursuant to which Rummel was sentenced:

[The] primary goals [of a recidivist statute] are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as

> felonies, to segregate that person from the rest of society for an
> extended period of time.  This segregation and its duration are
> based not merely on that person's most recent offense but also on
> the propensities he has demonstrated over a period of time during
> which he has been convicted of and sentenced for other crimes.

*Id.* at 284.

The *Ewing* plurality also cited to the decision in *Hutto* v. *Davis*, 454 U.S. 370, 375 (1982) (*per curium*).  In *Hutto,* the Court rejected a challenge to a forty year sentence of imprisonment (comprised of two consecutive twenty year sentences) to a defendant convicted of distribution of, and possession with intent to distribute, approximately nine ounces of marijuana.  The length of the sentences imposed represented approximately half of the maximum term of incarceration that could have been imposed under the statute of conviction.  *Id.* at 371.  In *Hutto*, the Supreme Court explained that *Rummel* stood "for the proposition that federal courts should be reluctant to review legislatively mandated terms of imprisonment, and that successful challenges to the proportionality of particular sentences should be exceedingly rare."  *Id.* at 374 (citations and internal quotation marks omitted).

The four dissenters in *Ewing*—Justices Stevens, Souter, Breyer and Ginsburg—issued two opinions in which all four dissenting justices joined.  Justice Breyer's opinion set forth the view that the "Court's precedent sets forth a framework for analyzing Ewing's Eighth Amendment claim," 538 U.S. at 35, recognizing that Courts should "find that the sentence fails the test only in *rare* instances."  *Id.* at 36 (emphasis in original).  Justice Breyer then adopted, "for present purposes," the analytical framework of the *Harmelin* plurality, 538 U.S. at 36, requiring the reviewing court to "first make 'a threshold comparison of the crime committed and the sentence imposed.'"  *Id*. (quoting *Harmelin*, 501 U.S. at 1005. "If a claim crosses that

threshold—itself a *rare* occurrence—then the court should compare the sentence at issue to other sentences 'imposed on other criminals' in the same, or in other, jurisdictions.  538 U.S. at 36 (quoting *Solem*, 463 U.S. at 290-91) (emphasis in original).

Justice Breyer also defined "[t]hree kinds of sentence-related characteristics" relevant to the initial stage of the inquiry: "(a) the length of the prison term in real time . . . (b) the sentence-triggering criminal conduct . . . and (c) the offender's criminal history."  538 U.S. at 37.

On the same day that *Ewing* was decided, the Supreme Court also announced its decision in *Lockyer* v. *Andrade*, 538 U.S. 63 (2003).  In that case, the Supreme Court reversed the grant of a writ of habeas corpus, holding that it was not an unreasonable application of clearly established federal law for the California Court of Appeal to affirm the imposition of two consecutive 25 years to life sentences in the case of a defendant convicted of stealing several videocassettes from a K-Mart store worth $84.70 and $68.84, respectively, on two occasions.  538 U.S. at 66, 77. Andrade had a lengthy criminal record, including two federal convictions for transportation of marijuana, and had stolen the videocassettes to support his long-term heroin addiction.  *Id.* at 67.

In contrast to these cases, the Supreme Court's only decision this century finding that a sentence was grossly disproportionate and therefore violative of the Eighth Amendment is its opinion in *Solem* v. *Helm*, 463 U.S. 277 (1983), in which the Court vacated a life sentence without possibility of parole for a defendant convicted of his seventh non-violent felony.  463 U.S. at 303.  The offense of conviction involved passing a bad check for $100, apparently while Helm was drunk.  *Id.* at 281.  The Supreme Court noted that Helm's prior convictions "although classified as felonies, were all relatively minor.  All were nonviolent and none was a crime against a person."  *Id.* at 296-97.  "Applying objective criteria," the Supreme Court found that

"Helm had received the penultimate punishment for relatively minor criminal conduct" and that this sentence was prohibited by the Eighth Amendment. *Id.* at 303.

In light of this history, the Supreme Court has itself acknowledged that "the precise contours" of the gross disproportionality principle "are unclear," *Lockyer*, 538 U.S. at 73 (citing *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring)), and that its precedents "exhibit a lack of clarity regarding what factors may indicate gross proportionality." *Id.* at 72.

The Courts of Appeals have had limited opportunities to conduct gross disproportionality review after *Ewing*. *See, e.g., United States* v. *Snype*, 441 F.3d 119, 152 (2d Cir. 2006) (recognizing that in *Ewing*, the Supreme Court observed that successful challenges were "exceedingly rare"). In one such case, however, the Ninth Circuit upheld a 30-year sentence imposed under the Guidelines for the manufacture of methamphetamine. *United States* v. *Barajas-Avalos*, 377 F.3d 1040, 1060 (9th Cir. 2004), *cert. denied*, 543 U.S. 1188 (2005). In that case, the Ninth Circuit reviewed the generation of Barajas-Avalos' offense level under the Guidelines, finding that it was determined based on the quantity of methamphetamine involved and had been enhanced for possession of firearms and obstruction of justice. *Id.* at 1060-61. Barajas-Avalos' had a single prior misdemeanor conviction, placing him in Criminal History Category I. *Id.* at 1061. His Guidelines sentencing range was 360 months to life. *Id.* The Court found that Barajas-Avalos had been "convicted of serious drug offenses" and that his sentence "was consistent with the Sentencing Guidelines." *Id.* Comparing his case to *Harmelin* and *Hutto*, the Court found that it was "not grossly disproportionate, nor does it violate the Eighth Amendment's ban on cruel and unusual punishment." *Id.*; *see also United States* v. *Knight*, 96 F.3d 307, 311 (8th Cir. 1996) (holding, without analysis, that career offender sentence did not

violate Eighth Amendment); *Terrebonne* v. *Butler*, 848 F.2d 500, 505-07 (5th Cir. 1988) (ruling that mandatory sentence of life without parole imposed on 21-year old heroin addict was constitutional even while acknowledging that "the tiger trap has sprung on a sick kitten").

**B.     Discussion**

### 1.     The Imposition Of A Mandatory Minimum Sentence On Egipciaco Remains Constitutional After *Booker*

Egipciaco "recognize[s]" that Section 841(b)(1) "has withstood previous challenges to its constitutionality," but contends that none of these decisions rely on "the disproportionalitry of treating real and manufactured drug conspiracies in the same manner for purposes of sentencing." (Mem. 10-11).  Egipciaco claims that "proportionality is clearly in doubt" because Section 841(b)(1) "requires that Mr. Egipciaco be punished just as severely for participation in a 'manufactured' (or 'imaginary') offense, as he would have been punished had the contemplated substantive offense been real."  (Mem. 13).  He cites to stray comments from the legislative history and concludes that there is "no rational basis" to sentence Egipciaco to the statutory mandatory minimum.

Egipciaco is entirely wrong.  His central error is that his argument necessarily relies on an incorrect understanding of sentencing procedure:  that he is entitled to an individualized sentence based on the exercise of judicial discretion.  With respect to his particular offense facts, However, the Second Circuit has squarely held that outside the context of capital cases, "there is no constitutional right to judicial discretion in individualized sentencing."  *United States* v. *Vizcaino*, 870 F.2d 52, 55-56 (2d Cir. 1989).  As the Supreme Court explained in *Chapman* v. *United States*, where it rejected a due process challenge to a provision of 21 U.S.C. § 841(b)(1):

-19-

> Congress has the power to define criminal punishments without giving the courts any sentencing discretion. Determinate sentences were found in this country's penal codes from its inception, and some have remained until the present. A sentencing scheme providing for individualized sentences rests not on constitutional commands, but on public policy enacted into statutes.

*Chapman*, 500 U.S. at 467 (citations and quotation marks omitted). *See also Mistretta* v. *United States*, 488 U.S. at 364 ("the scope of judicial discretion with respect to a sentence is subject to congressional control") (citing *Ex parte United States*, 242 U.S. 27, 41-53 (1916) (holding that district court lacked authority to suspend mandatory minimum sentence required by statute)); *McMillan* v. *Pennsylvania*, 477 U.S. 79 (1986) (upholding state's mandatory minimum sentencing statute); *United States* v. *Coleman*, 166 F.3d 428, 431 (2d Cir. 1999) ("A person duly convicted of a crime may be subjected to whatever penalty the statute authorizes, 'so long as the penalty is not based on an arbitrary distinction[.]'") (quoting *Chapman*, 500 U.S. at 465); *United States* v. *Pineda*, 847 F.2d 64, 65 (2d Cir. 1988) (rejecting due process challenge to § 841(b)(1)); *United States* v. *Collado-Gomez*, 834 F.2d 280, 281 (2d Cir. 1987) (same).

In *Vizcaino*—after observing that the appellant had failed to identify any precedent recognizing, "even inferentially[,]" a due process right to judicial discretion in individualized sentencing—the Second Circuit commented: "One would suppose that such a right, if it existed, would surely have been recognized by now, given the varying mandatory minimum sentencing practices the federal government and the states have used in our nation's history." *United States* v. *Vizcaino*, 870 F.2d at 56. Since that time, mandatory minimum sentences have been challenged on every conceivable constitutional ground, including the ones on which Egipciaco relies; and yet, no due process right has ever been recognized and, to the contrary, has been repeatedly rejected, including by the Supreme Court. Precedent dictates the same result here.

-20-

Egipciaco also argues that mandatory minimum sentences are not constitutional because Guidelines Section 5G1.1, which requires the imposition of mandatory minimum sentences when they exceed the applicable Guidelines range, is no longer mandatory. (Mem. 11). This argument misses the point: the sentence here is not mandatory because of Guidelines Section 5G1.1. Rather, it is mandatory because of Section 841(b)(1)(A). Section 5G1.1 did not create mandatory minimum sentences, but simply is a recognition by the Sentencing Commission that it was senseless for the Guidelines to recommend imposition of an illegal sentence for a defendant whose Guidelines range was lower than his or her mandatory minimum sentence.

Egipciaco further contends that mandatory minimum sentences are subject to the rule of *Apprendi*. However, this argument falls flat because the mandatory minimum sentence to be imposed here does comply with the rule of *Apprendi*. The jury found that Egipciaco participated in a conspiracy to distribute five kilograms or more of cocaine, the necessary triggering fact for an enhanced penalty under Section 841(b)(1)(A). Moreover, the fact of Egipciaco's prior conviction is one that need not have been proved to a jury beyond a reasonable doubt under the rule of *Apprendi*. In *Apprendi*, the Supreme Court made the point unmistakable:

> *Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.

*Apprendi* v. *New Jersey*, 530 U.S. 466, 490 (2000) (emphasis added); *see also United States* v. *Estrada*, 428 F.3d at 391 ("We therefore join the Third, Seventh, Eighth and Tenth Circuits in rejecting a claim that, after *Booker*, prior felony drug offenses are an element of the crime under § 841(b)(1)(A)."). Therefore, the vitality of *Harris* v. *United States*, 536 U.S. 545 (2002), which

held that *Apprendi* did not apply to the imposition of mandatory minimum sentences, is of no

significance here.[4]

### 2. Egipciaco's Mandatory Minimum Sentence Does Not Amount To Cruel And Unusual Punishment

Egipciaco's belief that his sentence is disproportionate is an apparent attempt to invoke

the Eighth Amendment prohibition against cruel and unusual punishment.  Although Egipciaco

does not appear to invoke expressly the Eighth Amendment in his memorandum, the law of the

Eighth Amendment governs proportionality challenges to sentences.  However, any Eighth

Amendment claim by Egipciaco would surely fail, as "successful challenges to the

constitutionality of particular sentences are extremely rare."  *United States* v. *Valdez*, 16 F.3d

1324, 1334 (2d Cir. 1994).  Indeed, the Second Circuit has specifically held that "lengthy prison

sentences, even those that exceed any conceivable life expectancy of a convicted defendant, do

not violate the Eighth Amendment's prohibition against cruel and unusual punishment when

based upon a proper application of the Sentencing Guidelines or statutorily mandated

consecutive terms."  *United States* v. *Yousef*, 327 F.3d 56, 163 (2d Cir.), *cert. denied*, 540 U.S

933 (2003).

Here, Egipciaco was convicted of participating in a conspiracy to sell cocaine, cocaine

which he intended to steal from another person in a gunpoint robbery in a public restaurant

during the early evening hours.  After stealing the cocaine, he intended to sell it to others.  The

amount of cocaine to be stolen and resold was substantial: ten kilograms of cocaine, with a street

---

[4]  At any rate, after the Second Circuit's decision in *United States* v. *Gonzalez*, 420 F.3d 111 (2d Cir. 2005), *Harris* no longer controls the imposition of mandatory minimum sentences under Section 841(b)(1).  Egipciaco's verdict complied with *Gonzalez* because the jury was asked to make the requisite finding on drug weight.

valuing verging on $250,000.  While Egipciaco is correct that there were not actually 10 kilograms of cocaine for him to steal, Egipciaco did not know this when he organized a robbery crew and agreed to carry out the robbery.  He fully believed that he would need to take the drugs by force, and he was prepared to do just this.

From the perspective of Egipciaco's intentions, then, his crime was no less serious than if the drugs had actually existed.  Congress surely knew, when it enacted Title 21, United States Code, Section 846, that drug investigations often rely heavily on the use of confidential informants to structure sting operations in which there is no risk that drugs will ever be distributed to customers.  And yet Congress provided that the penalties for participating in a conspiracy to distribute narcotics were the same as for a substantive violation.  *See* 21 U.S.C. § 846 ("[a]ny person who . . . conspires to commit any offense . . . shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy.").  The premise of Egipciaco's argument—that sting operations should lead only to short sentences—makes no sense and is at odds with the apparent congressional intention.

Furthermore, Congress has specifically and legitimately determined to punish narcotics distribution crimes severely.  This legislative decision is clearly reflected in the statutory penalties set forth for violations of Title 21, United States Code, including various crimes for which mandatory minimum prison terms are imposed, and the fact that the distribution of any heroin or cocaine may be punished by 20 years' imprisonment.  As Justice Kennedy recognized in *Harmelin*, "[p]ossession, use, and distribution of illegal drugs represent one of the greatest problems affecting the health and welfare of our population.  [Harmelin]'s suggestion that his

crime was nonviolent and victimless . . . is false to the point of absurdity."  501 U.S. at 1002.

Egipciaco's claim is equally false and absurd.

Moreover, Egipciaco's real offense is clearly more serious than those at issue in nearly every other Eighth Amendment case discussed above.  *See Rummel*, 445 U.S. at 265 (obtaining $120.75 by false pretenses leading to a life sentence); *Ewing*, 538 U.S. at 17 (theft of three golf clubs leading to a 25-year sentence); *Lockyer*, 538 U.S. at 66 (shoplifting of video tapes leading to a 50-year sentence); *Hutto*, 454 U.S. at 374 (possession of approximately nine ounces of marijuana leading to a 40-year sentence).  Unlike in many cases where Eighth Amendment claims have been rejected for even longer sentences, Egipciaco engaged in a serious offense that Congress has selected for substantial punishment based upon the obvious societal harm flowing from the prohibited conduct.

Egipciaco downplays the seriousness of his crime, casually describing it crime as "fictitious" or "imaginary," essentially making the same arguments of his innocence that the jury swiftly rejected at trial.  There is nothing less serious about this offense, when viewed from Egipciaco's perspective, than an offense in which people actually stood a chance of being harmed, either from the drug dealing that Egipciaco hoped to practice, or from the robbery that he expected to carry out.  This prosecution involved nothing more than a time-honored approach to investigation that involves the apprehension of criminals before they carry out their crimes.  "Artifice and stratagem may be employed to catch those engaged in criminal enterprises."  *Sorrells* v. *United States*, 287 U.S. 435, 441 (1932).[5]

---

[5]  The use of a "fictitious" victim is, of course, far preferable to an approach that actually allowed defendants to come close to carrying out real crimes against real victims.  As Judge Friendly explained in *United States* v. *Archer*, 486 F.2d 670, 676-77 (2d Cir. 1973), "[i]t would be

Moreover, Egipciaco's lengthy sentence of imprisonment follows his prior conviction for another controlled substances offense, as well as his conviction for driving while intoxicated, and he committed the instant offense while on probation. His criminal history, therefore, stands in contrast to those of some of the defendants in the Supreme Court's relevant precedents. *See*, *e.g.*, *Harmelin* (first-time offender); *Rummel* (fraudulent use of credit card; passing a forged check).

Egipciaco also contends that his argument is entirely novel—that no one has ever challenged the disproportionality of imposing the same penalties on a defendant arrested in a sting operation as those imposed on defendants arrested in other investigations. Egipciaco's claim, however, is merely another species of the same type of disproportionality claim that the Second Circuit has rejected in the context of narcotics trafficking. *See United States* v. *Valdez*, 16 F.3d at 1334 (rejecting claim that "merely middle-level drug dealers" should not receive sentences of life imprisonment and holding that "sentences of life imprisonment for narcotics dealers are not 'cruel and unusual' within the meaning of the Eighth Amendment"); *see also United States* v. *Jackson*, 59 F.3d 1421, 1424 (2d Cir. 1995) (rejecting Eighth Amendment claim by defendant who sold fifty grams of crack cocaine and received 10-year sentence, holding that "[e]ven mandatory sentences of life imprisonment without the possibility of parole do not violate the Eighth Amendment simply because they are mandatory.").

---

unthinkable . . . to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction." Egipciaco tries to use this understandable and commendable caution on the part of the investigating agents to reduce his sentence based on a newly fashioned "no harm, no foul" exception to mandatory minimum sentencing. Nothing in law, logic or experience supports this view.

Furthermore, although Egipciaco faces a lengthy term of imprisonment, his sentence was shorter than many of those considered by the Supreme Court in its Eighth Amendment jurisprudence. His sentence of 20 years' imprisonment on the narcotics conspiracy count[6] (which will likely be approximately 17 years' after good-time credit) is simply not comparable to the 40-year, 50-year, and life sentences of imprisonment described above. His prison sentence, though long, is not unreasonably so.

Egipciaco's offense of conviction, moreover, carried a maximum statutory penalty of life imprisonment. *See* Section 841(b)(1)(A). A 20-year sentence on the narcotics count will be well below the statutorily permissible maximum penalty. And as set forth in *Harmelin* and reiterated in *Ewing*, deference to legislative decisions regarding sentencing is at the forefront of proportionality review. *Ewing*, 538 U.S. at 23. Congress plainly articulated an intent to punish drug dealers who participated in conspiracies to distribute significant amounts of drugs after sustaining prior narcotics convictions in this fashion. This was a proper policy choice, and it should be respected by the federal courts.

Finally, the "threshold" inquiry for a reviewing court is whether a comparison of the crime committed to the sentence imposed "leads to an inference of gross disproportionality." *Ewing*, 538 U.S. at 30 (quoting *Harmelin*). Assessed against the relevant precedent, no such inference arises in this case. As set forth above, Egipciaco's claim compares unfavorably even with those in which the Supreme Court has rejected challenges to a sentence premised upon the Eighth Amendment. In *Ewing*, the Supreme Court found that a sentence of 25 years to life

---

[6] Only 20 years of the mandatory minimum sentence that Egipciaco faces are attributable to the narcotics conspiracy count. The remaining 5 years are the result of his firearms offense.

imprisonment for a defendant did not raise an inference of gross disproportionality where the offense of conviction was the theft of three golf clubs. 538 U.S. at 30-31. In *Harmelin*, the Supreme Court upheld a sentence of life imprisonment without parole for a first-time felony offender charged with a narcotics felony. 501 U.S. at 996. In *Hutto*, the Supreme Court upheld a 40-year term of imprisonment for a repeat offender charged with distributing, and possessing with intent to distribute, nine ounces of marijuana. 454 U.S. at 374-75.

In *Rummel*, the Supreme Court upheld a sentence of life imprisonment imposed for a third non-violent felony of obtaining $120.75 by false pretenses. 445 U.S. at 285. The *Rummel* Court expressed its understanding of, and deference to, the legislature's interest, "expressed in all recidivist statutes, in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal laws." *Id.* at 276. In short, the Supreme Court has consistently countenanced harsher penalties against persons with either a lesser criminal history or a less serious offense of conviction than Egipciaco.

Egipciaco's circumstances are also far different from those in *Solem*, where the defendant's crime of passing a bad $100 check was "one of the most passive felonies a person could commit." 463 U.S. at 296 (quoting dissenting opinion before North Dakota Supreme Court). The defendant's criminal history consisted exclusively of nonviolent crimes. *Id.* at 296-97. Yet the sentence that had been imposed—life in prison without possibility of parole—was the harshest then available under North Dakota law. *Id.* at 297. Egipciaco's case is thus wholly different from *Solem*.

Egipciaco has a prior narcotics conviction, and he was convicted in the instant case of a type of felony—narcotics distribution—that Congress has specifically sought to punish harshly. As noted, the defendant's sentence is far less than the statutory maximum. In the context of the Supreme Court's decisions, this 20-year sentence simply does not give rise to an inference of gross disproportionality and his appeal should be denied on that basis.

Stripped of their almost nonexistent legal foundation, Egipciaco's constitutional arguments are reduced to criticisms of the wisdom of mandatory minimum sentences, which, according to Egipciaco, are subject to "growing dissatisfaction." (Br. 11). These criticisms, however, do not constitute a legal argument properly addressed to this Court, but rather are policy arguments that should be made to "Congress, the States and the democratic process." *Harris* v. *United States*, 536 U.S. 545, 569 (2002).[7]

In short, a proportionality review of the sentence to be imposed here shows that Egipciaco cannot contend that his sentence is so grossly disproportionate that imposition of a mandatory minimum sentence would be unconstitutional. This Court should reject Egipciaco's claim that his sentence is unconstitutional.

---

[7] Even courts and commentators critical of mandatory minimum sentencing schemes recognize that they are constitutional and that concerns about their wisdom must be addressed through the legislative process. *See, e.g., United States* v. *Hildenbrandt*, 378 F. Supp. 2d 44, 46 (N.D.N.Y. 2005) ("While the Court is troubled that Congress statutorily requires it to impose unjust sentences in certain cases, that is Congress' power, and the Court will enforce it."); *United States* v. *Dyck*, 287 F. Supp. 2d 1016, 1019 (D.N.D. 2003) (criticizing mandatory minimum sentences as "unwise mechanisms of justice," but recognizing that the venue for change is through appeal "to our congressional delegation"); *see also* Gerard E. Lynch, *Sentencing Eddie*, 91 J. Crim. L. & Criminology 547, 554-55 (2001) ("Severe mandatory minimum sentences are "for better or worse, our social policy, adopted by democratically-elected officials and generally endorsed by a majority of the nation's people. It is clear to me that it is a judge's duty to enforce that policy, whether or not she would vote for it as a legislator, out of respect for the law of a democratic polity.").

### 3.     The Probation Office Properly Calculated Egipciaco's Guidelines Range

Egipciaco contends that he should not receive a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) based on his role in the robbery conspiracy. (Mem. 18). Egipciaco is wrong. Although Egipciaco's sentence is driven by his mandatory minimum sentence, and not by the Guidelines range that this Court is required by *Crosby* to consider, the Probation Office's Guidelines calculations are entirely correct.[8]

The Second Circuit has held that a two-level enhancement under U.S.S.G. § 3B1.1(c) may be applied "if it is shown by a preponderance of the evidence that a defendant was an 'organizer, leader, manager or supervisor' of another 'criminally responsible participant in the criminal scheme." *United States* v. *Brinkworth*, 68 F.3d 633, 641 (2d Cir. 1995) (citing U.S.S.G. § 3B1.1(c)). "To qualify for an adjustment under U.S.S.G. § 3B1.1, 'the defendant must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.'" *United States* v. *Leonard*, 37 F.3d 32, 38 (2d Cir. 1994) (quoting *United States* v. *Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990)).

Moreover, a manager or supervisor only need have managed or supervised one other participant in the criminal activity. *See* U.S.S.G. § 3B1.1, comment. (n.2) ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). Among the factors listed in the commentary to Section 3B1.1 are "the exercise of decision making authority" and "the recruitment of

---

[8]   The resolution of this issue is immaterial for another reason. Given the multiple count analysis undertaken pursuant to U.S.S.G. § 3D1.4, the robbery count ultimately did not increase Egipciaco's Guidelines range.

accomplices." U.S.S.G. § 3B1.1, comment. (n.4). The Second Circuit has determined that a two-level enhancement "would clearly be proper" if a defendant was substantially involved in the recruitment and supervision of a lower level participant. *United States* v. *Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995).

Here, ample facts support the conclusion that Egipciaco was a manager or supervisor in the conspiracy. Egipciaco conducted all the negotiations with Burgos. He appeared to direct Williamson during the meeting, when he told Williamson to show the gun to Burgos. Egipciaco also plainly recruited Williamson and the third, unarrested participant to join in the robbery. This is plain from the circumstantial evidence; how else would Williamson have learned about the robbery if not from Egipciaco? In the context of the evidence at trial, Egipciaco was plainly a manager, organizer, leader or supervisor of the criminal activity, and the evidence of his recruiting and supervision of Williamson is more than enough factual support to support application of the role enhancement.

Finally, Egipciaco contends that this Court should decline to make Guidelines findings, such as these, that are not supported by jury findings. However, as Egipciaco recognizes, the Second Circuit has squarely and repeatedly this argument in *United States* v. *Vaughn*, 430 F.3d at 526, and other post-*Booker* cases.[9] For example, in *United States* v. *Garcia*, 413 F.3d 201, 219 (2d Cir. 2005), the defendants asserted, as Egipciaco asserts here, that "the Sixth Amendment right to trial by jury requires facts triggering particular sentencing ranges to be proved beyond a

---

[9] Egipciaco contends that *United States* v. *Vaughn*, 430 F.3d 518 (2d Cir. 2005), is incorrect because it is at odds with the "merits majority" in *Booker*. (Mem. 4 n.2). Egipciaco is mistaken. The so-called "merits majority" opinion only declared that the Guidelines as they existed—mandatory and binding—were unconstitutional. Nothing in *Vaughn* runs afoul of this rule, as *Vaughn* never treats the Guidelines as anything but non-mandatory.

reasonable doubt to a jury or specifically admitted by the defendant." The Court rejected this

argument:

> Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives *Booker.* . . . This task is to be performed "in the same manner as before *Booker,*" because "with the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection. Thus, the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."

*Id.* at 220 n.15 (quoting *Crosby*, 397 F.3d at 112); *see also United States* v. *Gonzalez*, 407 F.3d

118, 125 (2d Cir. 2005) (rejecting the argument that a sentence is invalid if there is no jury

finding or admission by the defendant as to the drug quantity involved in the offense).

In short, for all of these reasons, the Court should adopt the Guidelines recommendations

presented by the Probation Office in the Presentence Report.[10]

### 4. Even If Permitted, Nothing In Section 3553(a) Supports A Non-Guidelines Sentence

Although the Court is powerless to impose a sentence beneath the mandatory minimum in

this case, the Government submits that no such sentence would be appropriate in any event.

There is simply nothing about his personal circumstances, the nature of the offense, or the

purposes of punishment, that supports this request.

---

[10] Egipciaco also contends that the Probation Office should not have discussed the mandatory minimum sentences in the Presentence Report. Of course, given that Egipciaco's mandatory minimum sentence exceeded his Guidelines range, the Probation Office needed to present these calculations to the Court.

Egipciaco's record is a mixed one at best.  Egipciaco points to his work history, but he was terminated from one job because when he was given a delivery assignment, he refused to drive the designated route.  (PSR ¶ 90).  Egipciaco also claims that he worked for Snapple Beverage Distributor, but that business has no record of his employment.  (PSR ¶ 89).  Egipciaco was not financially responsible, accumulating some $15,000 in personal debt despite an erratic work history.  (PSR ¶ 96).

Egipciaco's sentencing memorandum discusses his "struggle with addiction," but the Presentence Report indicates that Egipciaco's prior statements about his drug abuse are hard to reconcile.  He did complete a drug treatment program, but stated to the Probation Office that "his reason for entering the program had more to do with trying to change his life than trying to stop his drug use."  (PSR ¶ 79).  He told the Pretrial Services Agency that he had a cocaine addiction problem, and also told the New York City Department of Probation about his history of cocaine use.  (PSR ¶ 80).  However, he told the Probation Office that he never tried any drug other than marijuana.  (PSR ¶ 78).  Egipciaco's mother told the Probation Office that her son never has had a drug problem.  (PSR ¶ 79).  It is plain from these comments that Egipciaco is not an accurate self-reporter of his drug abuse history.

In short, while the Presentence Report includes some suggestions about Egipciaco's youthful promise, he has not demonstrated anything that indicates that his case is different from the "overwhelming majority of cases" in which a Guidelines sentence (or here, the statutorily mandated minimum sentence) would be reasonable.

## **CONCLUSION**

For all of the foregoing reasons, Egipciaco should be sentenced to a term of imprisonment that is not less than the 300-month mandatory minimum sentence.

Dated:        New York, New York
                May 30, 2006

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney


_____
HARRY SANDICK
NEIL M. BAROFSKY
Assistant United States Attorneys
(212) 637-2340/2333

<u>CERTIFICATE OF SERVICE</u>

HARRY SANDICK deposes and says that he is employed in the office of the United States Attorney for the Southern District of New York,

And that on May 30, 2005, he caused a copy of the Government's Sentencing Memorandum to be served, by First Class Mail, upon:

Richard Jasper, Esq.
276 Fifth Avenue
Suite 501
New York, New York 10001

I declare under penalty of perjury that the foregoing is true and correct, pursuant to Title 28, United States Code, Section 1746.

Dated:     New York, New York
          May 30, 2005

_____
HARRY SANDICK