# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

August 28, 2019

**VIA ECF**
Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: <u>United States v. Daniel Egipciaco</u>, 05 Cr. 202 (JGK)

Dear Judge Koeltl:

  Thirteen years ago, this Court was required to impose a mandatory minimum sentence of twenty five years on a man who had never before served a prison sentence for a crime that was fabricated by a government witness and that involved drugs that did not exist. Repeatedly, this Court expressed its view that the punishment did not fit the crime and asked the government to untie the Court's hands, to give it the ability to impose a lower sentence.

  Finally, thirteen years later, the government has done just that. The government has consented to the vacatur of Mr. Egipciaco's conviction under 18 U.S.C. 924(c) (and with it, the mandatory consecutive five year sentence) and has requested that a *nolle prosequi* be filed with respect to the prior felony information that doubled Mr. Egipciaco's mandatory minimum sentence because the government has "concluded that imposing the enhanced penalties . . . would not be in the interests of justice." (Gov't Letter *Nolle* Letter, August 27, 2019).

  Today, the interests of justice point to the mandatory minimum sentence of 120 months. The attached exhibits make clear that the statutory sentencing goals have been achieved: Mr. Egipciaco has long-since been rehabilitated and deterred from future misconduct. Where the overly-harsh sentence of twenty-five years led to derision of the law, the amelioration of his sentence will promote respect for the law and do as much as possible to avoid unwarranted sentencing disparities. Most importantly, it will recognize Mr. Egipciaco's incredible dedication to returning home to live a productive, law-abiding life.

### Stash House Sting Cases, Mandatory Minimum Sentences, and the Holder Memo

  Mr. Egipciaco was arrested on February 3, 2005. If the sting that led to his arrest had been conducted even five years later, this case would have turned out very differently. As this case has progressed, the Court has noted the many mitigating factors in the case. Prior to imposing the required 25-year sentence, the Court quoted the Second Circuit's opinion in <u>United States v. Ebbers</u>, 458 F.3d 110 (2d Cir. 2006), just days after it was issued. "Twenty five years is

Hon. John G. Koeltl                                             August 28, 2019
United States District Judge                                            Page 2

Re:     <u>United States v. Daniel Egipciaco</u>, 05 Cr. 202 (JGK)

a long sentence for a white collar crime, longer than the sentence routinely imposed by many states for violent crimes, including murder, or other serious crimes, such as serial child molestation." The Court then pointed out some of the mitigating facts of Mr. Egipciaco's offenses: "the fact that they arose in the context of a sting, the fact that the informant assured that the firearm was not loaded, and the fact that the prior felony conviction resulted in probation." <u>See</u> Docket Entry 78, Court Order Dated July 31, 2006. In 2016, in the context of denying Mr. Egipciaco's request for a reduction of his sentence under 3582(c) because it was not legally permitted due to the applicable mandatory minimums, the Court noted the "substantial evidence of [Mr. Egipciaco's] continuing rehabilitation and good conduct while incarcerated." <u>See</u> Docket Entry 114, Court Order Dated January 14, 2016. The Court further stated that "the Government is again requested to review the case to consider exercising its considerable discretion to agree to a procedural means to reduce the twenty-five year mandatory minimum sentence of imprisonment in this case."

Nationwide, the use of informants to ensnare defendants in conspiracies to rob nonexistent locations housing nonexistent drugs has come under fire. These cases bring to light the worst impacts of mandatory minimum sentencing schemes, where the amount and type of drugs involved can be made up and manipulated by the informant and his government handlers to hit a mandatory minimum threshold. <u>See</u> Molly F. Spakowski, <u>Crafted from Whole Cloth: Reverse Stash-House Stings and the Sentencing Factor Manipulation Claim</u>, 67 Buff. L. Rev. 451 (2019). These cases also have a racially disparate impact on men of color.[1] In response to these issues, some U.S. Attorneys offices have agreed to stop bringing these types of cases and have made favorable plea offers that avoid the disparate impact of the mandatory minimum sentences.[2] Courts have relaxed pleading standards for those attempting to challenge the racially disparate impact of these cases. <u>See</u>, <u>e.g.</u>, <u>United States v. Washington</u>, 869 F.3d 193, 213-14 (3d Cir. 2017); <u>United States v. Davis</u>, 793 F.3d 712 (7th Cir. 2015).

Professor Katie Tinto of the University of California, Irvine, Law School, has studied undercover policing and reverse sting cases like Mr. Egipciaco's. She became acquainted with Mr. Egipciaco while he was in custody after he reached out to her regarding her scholorship. Attached as Exhibit C is a letter she wrote in support of Mr. Egipciaco's clemency application. In it, she provides background information on these types of cases as well as changes in the way courts and U.S. Attorneys offices are approaching them. Her opinion is that the trends toward

---

[1]     Columbia Law Professor Jeffrey Fagan, who previously performed a statistical analysis of New York stop and frisk encounters, reported on the empirical evidence related to equal protection claims brought by stash-house sting defendants near Chicago. He found, for the three years he studied, that the ATF engaged in "nearly exclusive recruitment of non-White persons" and that the data suggested that Black and Hispanic persons were targeted for selection by the ATF. Large numbers of those recruited to participate in stash house stings did not actually meet the ATF's own characteristics of intended targets and that three distinct statistical tests showed "strong, consistent and statistically significant evidence that non-White suspects were more likely that White suspects to be targeted for recruitment into the Stash House Program." Professor Fagan's report, which was filed with the United States District Court for the Northern District of Illinois, is attached as Exhibit I.

[2]     A chart prepared by the University of Chicago Law School's Federal Criminal Justice Clinic shows the sentences imposed on stash house defendants in the N.D. Il., including those in the cases in which Professor Fagan's report was submitted. <u>See</u> Exhibit J. None received a sentence as long as 120 months.

Hon. John G. Koeltl  
United States District Judge

August 28, 2019  
Page 3

Re:         **United States v. Daniel Egipciaco, 05 Cr. 202 (JGK)**

favorable plea offers "reflect an attempt to address the criticism that the mandatory minimum sentences that result from these stings do no accurately reflect the criminal culpability of the offender and perhaps other criticisms surrounding the way in which the suspects are chosen and the racial makeup of those caught in the net of the stash house sting."   Exh. C at 3.

Even if this case had arisen out of a real plan to steal real drugs, as opposed to a fake stash house sting, Mr. Egipciaco's sentencing likely would have turned out very differently. Following the promulgation of the Holder Memo, as well as growing disapproval of penalizing someone with an additional ten years in jail as a result of their exercise of their Constitutional right to trial, Mr. Egipciaco likely would not have faced the filing of the prior felony information.[3]  Indeed, he may even have been offered a plea either to just the Conspiracy to Commit Hobbs Act Robbery count or to a reduced drug offense that did not trigger a mandatory minimum sentence.

As it stands, his mandatory minimum sentence of ten years still seems high and disproportionate. Given Mr. Egipciaco's background and his post-offense conduct, even the ten year mandatory minimum is greater than necessary to accomplish the statutory sentencing objectives. It is a sentence Mr. Egipciaco has long since served. But it remains the mandatory minimum.

### Mr. Egipciaco's Time, In His Own Words

Mr. Egipciaco describes serving his sentence as "more of a mental battle than a physical one."   His words are taken from an interview he gave to Christie Smythe while at Fort Dix. See Exh. A (Transcript of Daniel Egipciaco Interview).   The "devastation" of losing his trial left him "numb," especially because he knew that he was going to be sentenced to at least 25 years. "Life felt as if it was over," he says, "while my incarceration was only just beginning."

Following his sentencing, he spent six and a half years at the medium-high security prison at Otisville.   He spent his time there "in the same 6x9-foot, two man cell and lived through race riots, gang wars, hunger strikes and lock-downs. One winter there was no hot water, just cold showers."   He then was transferred to the low security facility at Fort Dix.

Mr. Egipciaco is candid about the mental impact of a lengthy prison sentence:   "The monotony of prison life can have a serious effect on your brain," he says.   "Every day is more or less repetitive, and if you don't create a routine for yourself the days become long and dull. You start to get caught up on the politics and small daily miseries. You focus less on preparing for your inevitable release and more on just day to day survival."

But Mr. Egipciaco did not want to become institutionalized.   He did not want to give up hope for the life he hoped to live outside the prison walls.   He explains, "I've avoided the feeling of institutionalization for the most part thus far by keeping my priorities in order as much

---

[3]     Mr. Egipciaco's co-defendant was not subject to the filing of a prior felony information. He completed his term of incarceration and was released on 7/28/2016.

Hon. John G. Koeltl                                                              August 28, 2019
United States District Judge                                                     Page 4

Re:            United States v. Daniel Egipciaco, 05 Cr. 202 (JGK)

as I can. I focus on bettering myself mentally, physically, spiritually, and emotionally so that upon my release I will leave a better person than I came in. My daily routine consist of working out, eating properly, reading AND studying my craft, maintaining strong communication with my loved ones, corresponding with my legal team to keep fighting for my freedom, taking what few programs are available that have potential to help my transition back to society an easier one, and maintaining my faith."

He describes a transition point that hits some people during their sentence, a point that sadly doesn't arrive for all. "There comes a point during incarceration that a transition becomes necessary (though some never make it)," he says. "To sit back and dwell on the amount of time you received, how bad the conditions are, how much you miss your freedom, who turned their back on you, etc., will only fill you with misery and resentment, and make your days a living hell. But once you accept the worst case scenario, and accept responsibility for the actions you took to be where you are, then you can begin to make that transition."

"For me," Mr. Egipciaco explains, "that transition began during my first year in prison after being sentenced. I knew deep down inside that I didn't deserve the time I got, but figured God must have a bigger plan for me and this here must be the turning point. I accepted the worst case scenario being that I was going to have to do every day of the 25 years I was sentenced to, but was determined to fight every day to regain my freedom and prepare myself in the meantime for my inevitable release."

As the Court has seen, both through updated progress reports from the BOP and Mr. Egicpacio's prior submissions to the Court, he has been successful in preparing himself for release. "I became proactive in my legal battle by studying law and researching cases, because no one knows your case better than you and no one is going to fight for your freedom harder than you," he explains. "I also signed up for the only program at the time that made sense to me, Young Men Incorporated, a Leadership Training Academy, designed to educate, motivate, and cultivate 'at risk' youth. That was the game changer for me. I worked my way up the ranks to become president of this Inmate Organization, and now facilitate classes, train others to help facilitate, and mentor members."

During his fourteen-plus years in custody, Mr. Egipciaco has essentially exhausted the BOP's course offerings, including available drug and alcohol treatment. In addition to working with Young Men Incorporated, he has maintained steady employment in the prison. Attached as Exhibit B is Mr. Egipciaco's most recent prison evaluation and reentry plan, as well as a list of his prison coursework, his resume, and a detailed description of the work his did with Young Men Incorporated.  His counselor reports that Mr. Egipciaco has a "positive attitude," has "mentored other inmates," and "maintained steady employment."  Mr. Egipciaco "is always professional and appropriate when communicating with staff and inmates.  His work ethic and his ability to communicate with staff makes him a positive role model for newly incarcerated inmates."

Hon. John G. Koeltl                                         August 28, 2019
United States District Judge                                Page 5

Re:        **United States v. Daniel Egipciaco, 05 Cr. 202 (JGK)**

      That he has thrived and excelled at Fort Dix does not mean that his time as been easy. "Now of course," he explains, "there are setbacks, sometimes more than you feel you can handle. Every time an appeal for your sentence to be overturned is denied you feel like quitting. Every time someone you love losses communication, forgets to put money on your books, misses a visit, or stops being supportive you feel more and more lonely. God forbid you lose a loved one while you're incarcerated. That sense of helplessness and guilt for not being there can eat you up."

### A Sentence of 120 Months is the Appropriate Sentence

      Mr. Egipciaco has shown that "out of the wreck [he] shall rise." Exh. A. He has stayed focused and determined, never losing sight of what he would do if this day arrived. He knows he was "fortunate to have a loving and supportive family holding me down through my incarceration," and he now looks forward to rejoining them and thriving and excelling outside the prison walls.

      Mr. Egipciaco's mother Alida remains "his biggest supporter." Exh. D (Letter of Alida Egipciaco). She has "witnessed his desire to turn his life around and to become a productive person upon his release and re-entry into society." Whenever it is that he is released, Mr. Egipciaco can return to his mother's home in Queens. She knows he "will continue with the enthusiasm he now has to try to help others to lead a productive life once he's released."

      Mr. Egipciaco's incarceration took a toll on the whole family, as his brother Reinaldo tells the Court. See Exh. E (Letter from Reinaldo Egipciaco). "We are so eager to have Daniel back with us," he tells the Court. His aunt Anna Felipe echoes this sentiment. "Daniel is an integral part of our family and we are looking forward to welcoming him home." Exh. F (Letter from Anna Felipe). The family is waiting with the love and support that Mr. Egipciaco needs to thrive. See Exh. G (Letter from Christopher Egipciaco). His family has secured him at least one job offer, see Exh. H (Letter from Nicolette Lekacjai), although he also hopes to continue his own support of other men on the path of rehabilitation.

      The substantial evidence of Mr. Egipciaco's rehabilitation and good conduct has continued to grow. He has multiple potential job offers waiting for him, from continued work with Young Men Incorporated to an Arthur Avenue pizzeria. Every sentencing factor counsels in favor of reducing Mr. Egipciaco's sentence to 120 months and sending him home to begin the rest of his life.

Hon. John G. Koeltl  August 28, 2019
United States District Judge  Page 6

Re:  <u>United States v. Daniel Egipciaco</u>, 05 Cr. 202 (JGK)

**Conclusion**

We respectfully request that the Court impose the mandatory ten-year sentence, to be followed by a five-year term of supervised release, and allow Mr. Egipciaco to begin his reentry process.

Respectfully Submitted,

/s/

Peggy Cross-Goldenberg
Assistant Federal Defender
212-417-8732

cc: AUSA Andrew Dember